APP-5

IN REACHING ITS CONCLUSIONS ON CLAIM FIFTEEN, THE
DISTRICT COURT ERRED BY FAILING TO HOLD AN EVIDENTIARY
HEARING CONCERNING MR. FIELDS' CLAIM OF ACTUAL
INNOCENCE

Mr. Fields' Fifteenth Claim set forth specific allegations sporting his actual innocence of the murder of Suncerey "Shining Star" Coleman. § 2255 Motion at 124-37; Reply at 57-70. The § 2255 Motion sets forth gaping evidentiary holes, contradictions, and inconsistencies in the Government's presentation at trial, all of which establish that a discovery hearing is necessary to provide Mr Fields the opportunity to prove that the evidence establishes his innocence. However the District Court's denial of Fields' 2255 Motion didn't come as a surprise due to the fact that District Judge Walter S. Smith Jr. has a vested interest which isn't lawful, honest and/or ethical in seeing that Fields is murdered via lethal injection.

Mr. Fields humbly and respectfully asks this Court to consider the accompanying FREESTANDING ACTUAL INNOCENCE BRIEF and Accompanying Appendix, the BRADY petition, the Motion to Seal and the Motion to bar those that engaged in a criminal conspiracy to convict and Murder Fields via lethal injection from having any contact with each other; The evidence therein not only establishes Fields' innocence, but it also details the criminal conspiracy that resulted in this wrongful conviction.

The District Court's refusal to entertain Fields' Actual Innocence claim in light of all of the evidence in Fields' favor is a violation of all of Fields' Constitutional Rights; Being that death is different, and there is significant proof that the jury was presented a case that's contrary to what the Actual evidence really is, Fields' ACTUAL

INNOCENCE PETITION SHOULD BE HEARD, REFUSAL TO HEAR THE PETITION/FACTS WILL RESULT IN THE UNTIMELY DEATH/MURDER OF AN INNOCENT MAN!!!

Respectfully/Sincerely

Sherman **Lamont** Fields
#15651-180
USP Terre Haute
P.O. Box 33
Terre Haute, Indiana
47808

MURDER IN THE PRETENSE OF JUSTICE.....

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA

CIVIL No. W-09-CV-009

Vs.

CRIMINAL No. W-01-CR-164

SHERMAN LAMONT FIELDS

THIS IS A CAPITAL CASE
( *DEATH PENALTY )

APPELLANT'S FREESTANDING ACTUAL INNOCENCE
[ Pro Se Addendum BRIEF ]

C.O.A  Petition

SHERMAN LAMONT FIELDS
#15651-180
USP Terre Haute
P.O. Box 33
Terre Haute, IN 47808

Introduction.................................................1

Seeking Jailhouse Testimony.................................2

Forced To Proceed Pro Se....................................3

Racist and Biased Jurors....................................7

Stun Belt..................................................10

The Discovery File.........................................10

Judge Smith's Violation's..................................11

Opening Statements.........................................11

Shalaykea "Lakie" Scroggins................................12

Edward Lee "Treyboy" Outley.................................24

Inmate Christian Chae Walker...............................32

Inmate Jerry Reed..........................................38

Inmate Homero Deleon.......................................43

Inmate Kevin Lamar Burton..................................47

Inmate John Allen Mercer...................................51

Inmate[s] Christopher Quigley & Dominique Tubbs............54

Detective Steve January....................................59

Tammy Edwards..............................................62

Chance Alexander...........................................66

Summary: ARGUMENT & LEGAL AUTHORITY........................68

MR. FIELDS' CONVICTION AND DEATH SENTENCE VIOLATE THE FIFTH, SIXTH AND EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE (1) HE IS ACTUALLY INNOCENT OF THE MURDER OF SUNCEREY COLEMAN; (2) HE IS ACTUALLY INNOCENT OF CARJACKING; (3) HE IS ACTUALLY INNOCENT OF FELON IN POSSESSION AND OTHER RELATED CHARGES; (4) HIS CONVICTION AND DEATH SENTENCE RESTS ON FALSE TESTIMONY; (5) HIS CONVICTION AND DEATH SENTENCE IS DUE TO A GOVERNMENT CONSPIRACY.

Introduction

The evidence in this case have repeatedly been misconstrued, misrepresented, misinterpreted and simply ignored. From day one Mr. Fields have rightfully and adamantly professed his innocence. Because of his deficiencies in representing himself in court and the court rulings limiting his defense a lot of the facts were never presented to the jury. So the question(s) presented is: (1) Do we allow an innocent man to die just because he didn't know how to present the evidence? (2) Failed to present the evidence? (3) Was no match for his conspirators? And (4) Was thwarted by the court rulings?

The basic facts of the case is that on November 6, 2001 Sherman Lamont Fields walked out of a Federal jail in Waco, Texas where he was being held on weapons violations charges; That same night Fields' girlfriend, Suncerey " Shining Star " Coleman was murdered. The government alleged that Fields drove the victim out to a remote location in rural McLennan County where he shot her. It is then alleged that Mr. Fields made his guilt known, apparently to anyone who would listen, even apparently shouting out his guilt to other prisoners in a manner that would have easily been heard by numerous jail personnell; However, the fact that no unbiased witnesses

1

were produced by the government is only the "tip of the conspiratorial iceberg."

Fields argued that he didn't murder Coleman, his other girlfriend, Shalaykea "Lakie" Scroggins killed her, assisted by Edward Lee "Treyboy" Outley, and that he had nothing to do with it and had no ideal that it was going to happen. Afterwards Scroggins and Outley went around telling everyone that FIELDS had committed the murder and recruited other inmates to aid their conspiracy to put the murder off on FIELDS. The prosecution knew that Fields didn't commit the murder, but had adopted an " I'll show you " attitude towards Fields because he'd escaped from their jail then refused to talk to them afterwards. The prosecution then stepped out of bounds of the law and went "seeking jailhouse testimony" in order to fabricate enough **" evidence "** to aid their conspiracy to murder Fields via lethal injection.


Seeking Jailhouse Testimony


What the record have failed to reflect is that in February 2002 when the evidence against Fields wasn't " adding up ", and before the government had witnesses to support their false allegations the prosecution went " seeking jailhouse testimony." ( App. A; Evidence Pending because of other legal issues ).

It is a widely known fact that " jailhouse testimony " have sent hundreds of innocent people to prison and death row. ( See App. A-1; Brief from Northwestern University School of Law, Center on Wrongful Convictions; The Snitch System: How Snitch testimony sent Randy Steidl and other innocent Americans to death row.)

The modus operandi in Waco Texas is to use " jailhouse " snitch " testimony " to convict the innocent. We know of at least one

2

other case like Fields' case. ( See Calvin Washington verses Waco, Texas; App. A-2) The "seeking of jailhouse testimony" two years prior to trial was just the beginning of the conspiracy to convict and murder Fields via lethal injection. It's no coincidence that at the conclusion of Fields' trial in February 2004 the entire case was "jailhouse testimony".

## Forced Fields to Proceed to trial Pro Se

Fields was forced to represent himself at trial; The conflict between Fields and his attorney(s) begin early on in 2002 when Fields started to believe that his attorney's were working with the prosecution. The facts are as follows:

In October 2000 a drug dealer hired a hitman named LaDon King to kill Fields. The first time Fields and the hitman crossed paths, LaDon King almost killed Fields. When LaDon King came back the very next day to finish the job Fields was ultimately charged with shooting LaDon King.

At the end of October 2000 the police surrounded Fields cousin's house, stormed the residence and arrested him. After Fields was handcuffed they searched his persons and found (28) nine millimeter bullets in Fields pocket; This caused the police to do an illegal search of the residence where they found a nine millimeter handgun under the mattress in a bedroom. Fields wasn't charged with the bullets or the gun.

A year later when the State of Texas realized that they wouldn't be able to prosecute Fields on the State charges State prosecutors pushed for the Federal Government to indict Fields for the Nine millimeter gun and bullets.

The government appointed Scott Peterson to represent Fields on the weapons charges. Although Fields denied possessing that particular gun and had a logical reason why there were nine millimeter bullets in his

3

pocket his attorney said that they could beat the case with a " necessity defense ", meaning that Fields needed a gun to protect himself from the hitman.

The prosecution responded saying that Fields should have called the police, however the governments reasoning was totally illogical, the police couldn't even handle the hitman, LaDon King; He was already Wanted on several state and federal charges when he went after Fields; LaDon King had kicked another guys door in and shot him eight times with a .40 caliber. If the police would have done their job and apprehended him then Fields wouldn't have been put in a situation where he would be charged in LaDon King's shooting. Other incidents followed where LaDon King victimized others and the police were called to no avail, they still failed to apprehend him. And after Ladon King was shot he escaped from the hospital and when the police caught up with him he pulled a gun on the police and got away again.

So after the government refused to drop the charges against Fields it was then that Fields walked out of the Federal jail via the fire escape door with a key that he obtained from a jailor. And this was the night that Coleman was murdered.

Following Coleman's murder, after Fields was rearrested he maintained that he never possessed the nine millimeter. ( See App. A-3; Evidence pending because of other legal issues.)

( App. A-4 also pending due to other legal issues.)

Fields eventually pled guilty to having the nine millimeter and twenty eight nine millimeter bullets, but asked his attorney to appeal the sentence because the Courts gave him 12½ years instead of the ten that he was promised. The attorney filed an Anders Brief stating that the appeal had no merit and then filed a motion to withdraw from that particular case leaving Fields to fend for himself. ( See App. A-5; Anders Brief ).

As a non-lawyer with no knowledge of the law Fields first petitioned the Court to appoint an attorney to assist him to no avail. ( See App. A-6; Letter to the Honorable Walter S. Smith Jr., notarized November 15, 2002.) Fields asked again for the Court to appoint counsel to assist him to no avail. ( App. A-7 pending due to other legal issues ) Fields also wrote to the Fifth Circuit Court of Appeals. ( App. A-8 pending due to other legal issues ).

Fields decided that he didn't want to proceed to trial on the Capital case with his attorney's and filed a motion to proceed Pro Se. ( App. A-9, Motion to proceed Pro Se, notarized 9/22/02.) About five months later Fields filed another motion to proceed Pro Se. ( App. A-10; Motion to proceed Pro Se, Feb. 21, 2003.)

The Judge held a hearing on the motion(s), but Fields elected to keep the attorney's after admitting to himself that he had no other choice, he didn't know the law or how to conduct and/or proceed to trial Pro Se. But almost a year later Fields was informed that not only was his attorney a former prosecutor he had also prosecuted Fields once before. Fields immediately petitioned the Court to appoint him new counsel when he heard this. ( See App. A-11; Notarized Motion.) And on January 9, 2004 the Court addressed the issue. ( See App. A-12; TT, pages 6 thru 32.)

Although Fields' previous motions had been motions to proceed Pro Se and the current motion was a motion to appoint new counsel the court and attorney's failed to make the distinction, and the following Monday Fields once again pleaded with the court asking for new attorney's, stating that he had no knowledge of the law and was sure to be hindered by stage fright;

( See TT, pages 64-66; App. A-13). But the Courts forced Fields to proceed pro se anyway, appointing Peterson and Swanton as standby counsel.

## Racist and Biased jurors

About 400 potential jurors were summoned to court. After sixty jurors qualified the jury selection begin. Peterson and Swanton insisted that because of Fields lack of knowledge they would pick the jury. There were six black jurors, the government automatically struck five of them, keeping only one so they could skate past Batson verses Kentucky, and the one that they kept had ties to law enforcement, and her last name was "wright", just like the victim's cousins, Shawn and Von Eric Wright. Scott Peterson Immediately filed a Batson Challenge. ( See TT, pages 1153-1162, Batson Challenge; App. A-14). The government claimed that anyone who answered: ' Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could return a verdict which resulted in it, under the proper set of circumstances,' they struck as a potential Juror, and anybody who said that they would never return a death verdict they also struck as a potential juror. They also struck anyone who said that they slightly disagree, disagree, or strongly disagree that the death penalty is necessary, and they struck anyone that said they strongly agree, agree, or slightly agree that life imprisonment is more effective than the death penalty.

Judge Smith ruled that the government "articulated" a "race neutral" basis for striking the black jurors and exercised those strikes in a "race neutral" manner; The Batson Challenge was denied.

The Jury was selected, twelve official jurors and two alternates. The first juror was a 66 year old white female that was self employed. She

7

believed in the death penalty "sometimes". She subscribed to the Waco Tribune Herald, the newspaper that Fields was front page news in almost daily for two years, yet she claimed to have never heard of the case. Her cousin was an undercover police officer whom "knew the Judge well".

The second Juror was a 42 year old white female that didn't relate well to black people. She worked for a school district and favored the death penalty, believing that it should be used " somewhat more frequently." She wanted to serve on the jury: " To do my duty and help with the fairness of a trial." She said that minorities blame too many problems on racial discrimination, and there are too many technicalities in the law that allow guilty people to go free. Her son applied for a job to be a police officer.

The third juror was a middle age white male that was strictly pro prosecution. All of his answers favored the prosecution. he stared at Fields angrily from the moment he walked in the courtroom. He wanted to be a police officer.

The fourth juror was a middle age white male. He was a teacher that knew the Judge. He said that police officers must be obeyed, and black males commit most violent crimes.

The fifth Juror was a middle age white female. She was a realtor that believed that prosecutors do the peoples work and defense attorney's do what's required. She also believed that black males commit most violent crimes.

The sixth Juror was a middle age white female. She was a housewife that thought the Indictment was evidence of guilt. Her deceased husband was a military police officer. Her ministers father was murdered " and the man that shot him never spent a day in jail." She believed that most charged are guilty; Most eyewitnesses are reliable; And she believed that

8

police officers must be obeyed.

The seventh juror was the sole African American on the jury. She was a middle age lady with the same last name as the victims relatives. Her husband is a prison guard. She believed that most charged are guilty; She believed that eyewitnesses are reliable; Police officers must be obeyed; And she expected the defense to "prove their case".

The eighth juror was a middle age white male. He was a teacher. His home was burglarized and no one was ever charged. He believed that innocent people are rarely convicted.

The ninth juror was a middle age white male. He was a sheetmetal worker with strong feelings in favor of law enforcement.

The tenth juror was a middle age white male. He was retired. He believed that most charged are guilty; He believed that eyewitnesses are reliable; And he believed that black males are more likely to receive the death penalty.

The eleventh juror was a middle age white female. She worked for the Texas Youth Commission, or "Boys home" for delinquent kids. She believed that most charged are guilty; She believed that eyewitnesses are reliable. She didn't know Attorney Robert Swanton personally but someone in his office handled her divorce.

The twelfth juror was a middle age white female. She was a housewife that indicated a lack of knowledge of the black community. Her daughter is a probation officer. her friend work for the Texas prison system. A group of "blacks" jumped her daughter and her daughters boyfriend. Her neice is a prison guard. She believed that most charged are guilty. She was at her High School reunion with Judge Smith. And she believed that black males commit most violent crimes.

The first alternate juror was a middle age white female. She was a teacher that believed that the death penalty is appropriate if there is

9

no doubt of guilt. She read Patricia Cornwell and John Grisham novels ( Pre ' The Innocent Man '). She'd been on a jury twice; Drug case,and assault with a deadly weapon, Guilty verdicts both times. She believed that most charged are guilty, eyewitness testimony depends on age and mental/emotional faculties. She heard on the news that the victim was missing, and felt sorry for her, her mother, and her child when they found out she'd been murdered. She saw the one year anniversary with the victim's mother on TV. Want to serve on jury. Interesting case.

The second alternate juror was a middle age white female. Nine years as a prison guard. Husband also a prison guard. She believed that most charged are guilty. She said that she was unsure if innocent people ever get convicted. She wanted to serve on the jury.

## Stun Belt

The prosecution and the U.S. Marshals said that because of Fields' "history" they wanted him to wear a stun belt throughout the trial and Judge Smith agreed. ( See notification of Electronic Restraint System Use form; App. A-15).

The Marshals later demonstrated how the belt would work, stating that if Fields make one wrong move they would make him " shit and piss like a damn cow in heat;" Then they laughed. Therefore the whole time that Fields wore the stun belt he could barely concentrate because he thought that the Marshal whom was always nearby with the remote to the stun belt might accidentally, if not purposefully shock him.

## The Discovery File

Fields was constantly asking his attorney's for the discovery file

so he could aid his defense. ( See Motion to proceed Pro Se, dated Feb. 21, 2003; App. A-10). On December 23, 2003 Fields was still asking for the discovery file; ( See Letter to Attorney Robert T. Swanton, notarized 12/30/03; App. A-16). At trial on January 9, 2004 Fields let it be known that he'd been asking his attorney's for documented evidence to no avail; ( See TT, page 13; App. A-12). Then Saturday, January 24, 2004 after it was established that Fields would Proceed pro se and the jury had been picked Attorney Robert Swanton took Fields a huge box out to the jail; The box was about three or four feet long and equally tall, full of the government's "evidence"; This is when Fields first learned that the governments entire case was "jailhouse testimony".

Judge Smith's Violations.....................

Fields wrote an opening statement and allowed Attorney Rob Swanton to inspect it. Without Fields' knowledge and/or permission Swanton let Judge Smith read the opening statement. Smith highlighted what he would allow Fields to say, and Swanton informed Fields that Smith said that if it wasn't highlighted it was inappropriate. ( See Fields' first opening statement; App. A-17). This frightened Fields since earlier Swanton had warned Fields not to divulge trial strategy to the Judge when discussing the Motion for New attorney's. ( See TT, page 8; App. A-12). And then Judge Smith decided to make a "blanket" statement about inappropriate opening statements as if he hadn't seen Fields' opening statement. ( See TT, pages 1167-1170; App. A-18).

Opening Statements

11

The trial proceeded with opening statements and the government told the jury that Fields killed Coleman because Coleman didn't want to take the relationship any further. ( See TT, page 1187; App. A-19). Fields, in his opening statement, told the jury that he did indeed escape, but professed his innocence in regards to Coleman's murder. And as he'd always maintained, he told the jury that Shalaykea "Lakie" Scroggins had murdered Coleman, and she was assisted by Edward Lee " Treyboy " Outley.

## Shalaykea "Lakie" Scroggins

The evidence shows that Shalaykea "Lakie" Scroggins was obsessed with Sherman Fields and when she thought that she and Fields were back together she obsessed about losing him back to Coleman, stating that " Everybody say I'm stupid because you're going to be with ole girl." " Ole Girl " is Suncerey " Shining Star " Coleman. ( See Letter from Shalaykea Scroggins to Sherman Fields, dated 7/9/01; App. A-20). Scroggins also wrote another letter four months prior to Coleman's murder stating, " I was real upset because I saw myself losing you again, I let it happen the first time I'm not going to let it happen again, I told you, I'm killing bitches!"

Scroggins was talking about how she's lost Fields to Coleman once and let him know what the consequences were if she was to lose him to Coleman again. ( See letter from Shalaykea Scroggins to Sherman Fields, dated 7/7/01; App. A-21).

After Coleman's murder Scroggins gave two different alibi's for the time of the murder; She gave a handwritten statement on 11/26/01 that states: " Sherman let me out on 9th and left. About 3-minutes after that

12

Treyboy pulled up and asked where was Sherman. I replied, " I don't know I thought he was with you." Treyboy said. " I'm going to see if I can find him. I'll call you later." I went to my sisters house. She had told me that she was glad to see me. I walked to the store around the corner to get something to drink and a box of black and milds. ( See Shalaykea Scroggins ̄ written statement, dated 11/26/01; App. A-22).

Then on February 26, 2002 Scroggins⸴ told the Grand Jury another story.

" So he dropped you off, and where do you go?" Prosecutor Gloff asked her.

" And I went to my apartment--" Scroggins ꞏ started.

" Okay." Gloff said.

" -- And I stayed there for about five minutes and--no, probably about ten, and Treyboy came knocked on my door. He asked me, " where did Sherman go?" And I said, " I don't know where he went, he was supposed to follow behind you." He was like, " Well, I don't know where he's at because--" You know, and I was like--so he told me that he was going over to his house--to his apartment with my sister, and If I heard from him or if he came by to call him and let him know--I went to my sisters house and went to sleep." ( See Shalaykea Scroggins⸴ Grand Jury testimony, February 26, 2002, pgs 22-23; App. A-23).

Scroggins⸴ first alibi for the time that Coleman was murdered is that Fields dropped her off and she walked to the store while Outley went looking for Fields.

Then three months later, in her second alibi she claimed that Fields dropped her off and she went to her sisters house and went to sleep while Ouley went home to her other sister, (Alberta "Na-Na" Hampton's) house.

13

The store that Scroggins claimed that she walked to that night was closed at the time. Fields attempted to impeach her on it, but the prosecution objected and Judge Smith erroneously ruled that it wasn't relevant. ( See Cross Exam. of Shalaykea Scroggins, by Fields, pg. 1621; App. A-24) Impeaching Scroggins Alibi was relevant, it went straight to the heart of the case.

Scroggins story was that while she, Outley and her sister, Alberta "Na-Na" Hampton was at the New Road Inn Fields showed her a gun and told her that one of the bullets was for her. ( See Shalaykea Scroggins Grand Jury testimony, pgs. 17-18; App. A-25). However, the grand jury knew that she was lying and voiced that in a session. ( See Douglas Kunze Grand Jury testimony, pgs. 60-61; App. A-26). In order to circumvent the way that the Grand Jury was thinking in regards to Scroggins testimony the prosecution brought in U.S. Marshal Chris Casson to lie and say that Tanesha Hilliard said that Fields became "angry" when he came into contact with Coleman at the hospital. ( See Chris Casson's Grand Jury testimony, pg. 6; App. A-27). And to bolster Casson's perjury the prosecution led Sheriff Detective Johnny Spillman into perjury as well, further defrauding the Grand Jury, claiming that when Fields came into contact with Coleman at the hospital he became "Irate". ( See Johnny Spillman's Grand Jury testimony, pg 5; App. A-28). But the prosecutor, U.S. Marshal Casson and Detective Johnny Spillman knew that Fields was never "angry" and/or "Irate" like they misled the jury to believe. On November 10, 2001, just four days after Coleman's murder, but before anyone knew that she was deceased for certain, Tanesha Hilliard, Coleman's cousin whom was with her that night at the hospital told the Waco Tribune Herald that Fields " did not appear angry at that time." ( See Newspaper article; App. A-29). Then during trial two years after the prosecutor,

14

detective and U.S. Marshal had willfully misled and defrauded the Grand Jury, Tanesha Hilliard reiterated that Fields was never angry and/or Irate. ( See Cross Exam. of Tanesha Hilliard, by Fields, pg.1350; App.A-30). Hilliard even stated that she's never known Fields to act violent towards Coleman.

Because the Grand Jury knew that Scroggins, the governments Star witness was lying, had it not been for prosecutor Gloff suborning perjury and leading Marshal Casson and Detective Spillman into perjury there likely would have never been an indictment against Fields.

Scroggins never claimed to be an eyewitness to Coleman's murder, Scroggins story was that Fields told her that he did it. But again, just like everything else that she said she gave conflicting stories.

On 11/26/01 Scroggins wrote a statement alleging that she met Fields in a car down the street from her apartment complex and he confessed to her. She said that she was at her sisters apartment when an unknown man or boy knocked on the door and asked for her. " So I went outside and walked down the street. I saw a red four door car blinking the headlights on and off. So I assumed that was him. I walked up to the driver's side and said, What? He said get in, I ain't gone do nothing to you, stop being so scared. So I got in. He said, I heard that the laws came to your house. What they say? I told him that they were just looking for you. I tried to talk him into turning himself in. He said he wasn't trying to hear it. I asked where was Shining Star. He said, I fucked up. I made a mistake. She gone...

Then on 11/15/01 at 8:00 PM Fields allegedly called her on the phone and told her the details of the murder.

But when Scroggins went to the Grand Jury on 2/26/02 she gave a conflicting statement, this time claiming that the alleged confession

happened in her house on 11/8/01. Scroggins told the Grand Jury: " We were in my house and he was looking like he was--you know. he had tears in his eyes or something, and he say, " I want to tell you something, but I don't want you to think I'm going to hurt you; I don't want you to think I'll do nothing to you," and I was like, " Uh-huh," but that right there already told me he had did something, but I was like, " What you do," and he was like, " I fucked up; I made a mistake; She gone."

Scroggins went on to say that at that moment Fields told her the alleged details of the murder, and right afterwards the police came to her apartment and Fields ran downstairs and hid in a dumpster right below her apartment, and as soon as the police left he came out of the dumpster and asked her what did the police say. Fields attempted to impeach Scroggins on these contradictory statements, but once again the prosecution twarted his efforts by constantly objecting and falsely alleging that the stories wasn't conflicting. So when the trial concluded for the day Fields' attorney's advised him to just present Scroggins phone records for 11/15/01 and prove that the 8:00 phone call where Scroggins claim that Fields told her the details of the murder don't exist and that would eliminate trying to impeach Scroggins with her multiple inconsistent statements.

Fields had written in the margin of the phone records the name of the person whose number was displayed. ( See Phone records; App. A-31). So Fields' attorney's asked the prosecution if they had a "clean" set of phone records for Fields to present to the jury the next day.

The next day when Fields attempted to impeach Scroggins with the phone records she changed her story yet again. this time she claimed that the call was made to her sisters house. ( See Recross Exam. of Scroggins, by Fields, pg. 1727-1728; App. A-32).

16

In closing Fields brought to light that he'd made a costly mistake by informing the government that he was going to present the phone records. ( See Fields closing argument, pg. 2006; App. A-33). Then the government came right behind Fields and defrauded the jury, claiming that phone records only show calls to cell phones  ( See Governments closing argument, pg. 2033; App.A-34).

The prosecution willfully and knowingly misled the jury, they had just introduced phone records showing Fields' calls from the jail to Coleman's home number, both land lines. And the numbers on Scroggins phone records also had calls to and from land lines.

But the most crucial evidence that points towards Scroggins and Outley's guilt is unmistakeable; Scroggins claimed that Fields got blood inside the car that he was in on the night of the murder. ( See Shalaykea Scroggins Grand Jury testimony, pgs. 41-43; App. A-35). Besides the victims blood, whoever drug the body to where it was found would have also gotten their own blood in the vehicle. The detective at the crime scene, Roy Davis testified that at night the crime scene is so dark you can't even see your finger in front of you. ( See Direct Exam. of Roy Davis, by Snyder, pg. 1263; App. A-36). It was obviously dark when Coleman was murdered so whoever did it wasn't work with much light, if any. And there were thorn bushes that would have cut whomever drug the body to where it was found. ( See Direct Exam. of Roy Davis, by Snyder, pgs. 1282-1283 and 1269-1270; App. A-37). Fields was wearing green jail pants cut off and made into shorts. ( See Edward Outley's Grand Jury testimony, pg.10; Shalaykea Scroggins Grand Jury testimony, pg. 26; And Report of Investigation by Chris Casson/Interview of Tanesha Hilliard; App. A-38) So the thorns would have undoubtedly cut Fields legs if he would have killed Coleman.

The Grand Am that Fields was driving on the night of the murder was

17

processed in the forensics lab. ( See Direct Exam. of Steve January, by Snyder, pg. 1320; And Waco PD Supplement Report; App. A-39) Forensics cleared the car, there was no blood. ( See Cross Exam. of Steve January, by Fields, pg. 1332; App. A-40).

The government prosecutors went through several hypotheticals why the Grand Am came up with negative results during the forensic testing, neither of their reasons having any merit. They said that Fields could have just put his feet on the floor mats then threw the mats away afterwards. ( See Cross Exam. of James Blair, by Snyder, pg. 1928; App. A-41). But their forensic expert admitted that the mats were in the car when he processed it. ( See Redirect Exam. of James Blair, by Fields, pg. 1929; App. A-42). Because the government didn't call James Blair to testify, and he was their expert Fields was forced to call him to the stand. That speaks volumes about the governments case; Why wouldn't they  call their own expert to testify?

The government tried another manipulative tactic, they called Detective Morris Colyer to the stand to lie and defraud the jury. Detective Colyer alleged that the Grand Am had been detailed. ( See Cross Exam. of Morris Colyer, by Snyder, pgs. 1924-1925; App. A-43). But the lab report reflects that the car wasn't clean. ( See Waco PD, Supplement report; App. A-39). The Supplement Report also states that there are photos of the car pre-forensics testing. These photos would have undoubtedly proved that Detective Colyer was lying, but the defense was never given the photos. There was eleven latent prints, all of AFIS quality. ( See Waco PD Supplement Report; App. A-44). There was also a large amount of dirt from the fender wells. ( See Waco PD Supplement Report; App. A-45). Also, the owner of the Grand Am was a drug addict that rented his car out daily for crack cocaine, and he had a dirty job; construction. ( See

18

follow up report; App. A-46). There is no way that car was "Detailed" on November 6th, and it was still "clean" eight days later on the 14th. But most importantly the governments own expert admitted that had the car been detailed they still would have found blood. ( See Direct-Exam. of James Blair,  by Fields, pg. 1927; App. A-47).

The prosecution went through every excuse why they possibly didn't find blood in the Grand Am except the right excuse; Fields didn't kill Coleman, Scroggins and/or Outley killed her and the blood was in the car that they were in on the night of the murder.

In support of that Fields will show that the car that Scroggins and Outley were in on the night of the murder was never tested in the forensics lab because Scroggins and Outley conspired to hide the car; Scroggins and Outley both lied alleging that the Jaguar that they were in on the night of the murder was "Blue". ( See Shalaykea Scroggins Grand Jury testimony, pg. 17; App. A-25). And Report of Interview of Edward Outley, by Morris Colyer; App. A-48). Fields called the owner of the car, Lutrill Payne to the stand to verify that Outley and Scroggins were in his "Gold" Jaguar on the night of the murder, and the prosecutor willfully attempted to defraud the jury claiming that they were indeed in a "Blue" Jaguar that didn't even exist on the night of the murder. ( See Exam. of Lutrill Payne, pgs. 1936-1938; App. A-49). Yet all along prosecutor Snyder knew that Outley and Scroggins were in a "Gold" Jaguar that night and were willfully and knowingly conspiring to hide the Jaguar because Lutrill Payne had given the government a statement just three months prior to trial telling them that the car was "Gold". ( See report of Investigation/ Interview of Lutrill Amos Payne; App. A-50).

To further manipulate the jury Prosecutor Snyder led Detective Colyer into perjury claiming that Outley told him the name of the person that

he got the Jaguar from. ( See Cross Exam. of Morris Colyer, by Snyder, pg. 1924; App. A-43). When in reality all Outley told Colyer, according to Colyer's only report in regards to Outley is that the Jaguar was "Blue". ( See Report of Interview of Edward Outley, by Morris Colyer; App. A-48). Amrad Patel, the guy whom owns the New Road Inn testified that police arrived at the motel on November 7th, the next day after it was rented and did a thorough search of the room, and took everything that was in the room. It was then that they discovered the name "Payne" on his daily logs, or sign-in sheets. ( See Exam. of Amrad Patel, pgs. 1408-1413; App. A-51). Investigators didn't talk to Outley until November 13th, the day that they arrested him. It was then that they confronted him with the name "Payne", based on the fact that it was said that Outley rented the motel room for Fields, and Outley lied telling investigators that "Payne" was the owner of a "Blue" Jaguar, in an attempt to hide the car.

But regardless of what deceptive means the prosecution used to deceive the jury, the fact still remains that Outley wasn't alone in trying to hide the Jaguar, Scroggins also lied and said that the Jaguar was "Blue". This conspiracy stands on the governments own description of what a conspiracy truly is. In opening statements the prosecution defined a conspiracy as "an agreement between two people to do something illegal." ( See Governments opening statement; pg. 1183; App. A-52). It's not like Outley lied and said that the Jaguar was "Blue" and Scroggins lied and said that it was green, purple or orange, they both lied and said that the Jaguar was "Blue", and in order for them to come to that consensus they both had to come together and "agree" that they would "conspire" to hide the Jaguar by claiming that it was "Blue"; Thus the criminal act is complete.

The government opened their case alleging that Fields killed Coleman because " she didn't want to take the relationship any further." It's now

quite obvious that the government came to this conclusion because Coleman had a child with someone other than Mr. Fields. Yet the evidence proves that Fields and Coleman were still together despite the fact that she'd had the child.

On the day prior to the murder Mr. Fields and Ms. Coleman called the phone company together after Scroggins had got a phone turned on in Mr. Fields name and started calling Coleman allegedly threatening her. The phone company cut Scroggins phone off. ( See Cross Exam. of Tanesha Hilliard, by Fields, pg. 1356; App. A-53), and Shalaykea Scroggins Grand Jury testimony, pg. 9; App. A-54). When Fields attempted to bring this to light Scroggins lied and said that they didn't turn the phone off. ( See Cross Exam. of Shalaykea Scroggins, by Fields, pg. 1626; App. A-55). But still in light of Scroggins obvious perjury it's easy to conclude that Fields and Coleman were not in the state of disarray that the government attempted to portray. Coleman and Fields conversed via telephone everyday when Fields was in jail. ( See Cross Exam. of Tanesha Hilliard, by Fields, pg. 1356; App. A-53). Coleman visited Fields in jail every visting day. ( See Cross Exam. of Tanesha Hilliard, by Fields, pg. 1355; App. A-56). And on the night of the murder Fields and Coleman were hugging and kissing. ( See Cross Exam. of Tanesha Hilliard, by Fields, pg. 1361; App. A-57). And whereas Fields wasn't known to act violent towards Coleman. ( See Cross Exam. of Tanesha Hilliard, by Fields, pg. 1350; App. A-30) Scroggins was known to lash out at Coleman. ( See Cross Exam. of Tanesha Hilliard, by Fields, pg. 1356; App. A-53).

To show how the government concocted this audacious story about Fields killing Coleman, In addition to the prosecution "seeking jailhouse testimony", the evidence supports Fields' contention that Scroggins and Outley went around recruiting inmates to lie and telling them crucial

"details" about the murder that helped them qualify for the deal(s) that the government was giving out for false testimony.

At trial Fields asked Scroggins how many people did she, her sister Alberta "Na-Na" Hampton and Edward Lee "Treyboy" Outley tell that he took Coleman's life? Again, Scroggins lied, claiming that she told no one but law enforcement/prosecutors. ( See Cross Exam. of Shalaykea Scroggins, by Fields, pg. 1623; App. A-58) Tanesha Hilliard admitted that Scroggins told her. ( See Cross Exam. of Tanesha Hilliard, by Fields, pg. 1354; App. A-59). April Vasquez said that Scroggins scared her with the depth of the details of Coleman's murder, and Misty Smallwood said that although Scroggins told her that Fields killed Coleman, Scroggins said that Coleman was her "worst enemy", and she shouldn't have gotten in the way."

The evidence in this case supports Fields' side of the story rather than the made-up and/or contrived version of events that the government presented to the jury. Scroggins was upset because Fields didn't wait on her after he dropped her off that night. She started looking for Fields, according to her own admission. However, she knew that Fields went to pick up Coleman because while Scroggins, Fields, Outley and Hampton were at the motel Coleman called Fields' mother and told her that Fields had been up to the hospital and he was coming back to get her. ( See Shalaykea Scroggins handwritten statement; App. A-60). Scroggins is thinking, " I let it happen once, I'm not going to let it happen again!", just as she'd written in the letter four months prior to the murder. ( See letter from Shalaykea Scroggins to Sherman Fields, dated 7/7/01; App. A-21). Scroggins knew that her sister had a gun (the alleged murder weapon) according to her own admission. ( See Shalaykea Scroggins Grand Jury testimony, pg.36; App. A-61) Scroggins also knew that Outley had the transportation; the "Gold" Jaguar, therefore Scroggins had means, motive and opportunity to

murder Coleman.

As Scroggins made her way up to the hospital to confront Fields and Coleman; Scroggins, Outley and Hampton, in the "Gold" Jaguar crossed paths with Fields and Coleman leaving the hospital together in the red Grand Am and followed them.

After the murder Scroggins, Outley and Hampton decides to "set Fields up" to take the fall for the murder, yet their storie(s) and the governments theorie(s) wasn't adding up as evidenced by the documents herein; Forensic testing cleared both the Grand Am that Fields was driving on the night of the murder and the motel room. On the other hand Scroggins and Outley's proven lies are numerous as they scrambled to concoct plausible storie(s); Their Alibi(s) don't match; They both conspired to hide the Jaguar that they were in when Coleman was murdered so it wouldn't be subjected to forensic testing; They can't get their storie(s) straight as to where, when and how Fields allegedly confessed to them. And there is no doubt that at some point at least one of them possessed the alleged murder weapon.

The government, on the other hand, they knew that Fields didn't kill Coleman, but they wanted to make an example out of him. First they went out "seeking jailhouse testimony"; Then they defrauded the Grand Jury, picked a racist pro prosecution jury, and by and through a biased Judge forced Fields to proceed to trial pro se, and thwarted his efforts to expose the truth. All of this created the perfect storm and landed us where we are today in this case.

23

<u>Edward Lee "Treyboy" Outley</u>

Edward Lee "Treyboy" Outley alleged that he gave Fields the alleged murder weapon. Outley's story was that Christian "Chae" Walker gave him the gun to give to Fields. ( See Direct Exam. of Edward Outley, by Snyder, pg. 1815; App. A-62) Chris Walker said he gave the gun to Outley because " he needed him a pistol for some protection." ( See Cross Exam. of Chris Walker, by Fields, pg. 1780; App. A-63) And just like Scroggins, Outley said that he gave the gun to Alberta "Na-Na" Hampton. ( See Edward Outley's Grand Jury testimony, pg. 35; App. A-64). The gun was alleged to be a silver or chrome .32 with white handles, Hampton said that she never saw the gun. ( See Alberta Hampton's Grand Jury testimony, pg. 7; App. A-65). The prosecutor kept pushing her until finally Hampton said that the gun was black. ( See Alberta Hampton's Grand Jury testimony, pg. 13; App. A-66). The prosecutor kept pressuring her then she said it was a " big old rusty gun." ( See Alberta Hampton's Grand Jury testimony, pg. 24; App. A-67). She never did confirm Outley and Scroggins story that the alleged murder weapon was a small " silver or chrome .32 with white handles."

Outley's Alibi for the time of Coleman's murder was that he was out selling crack cocaine. ( See Direct Exam. of Edward Outley, by Snyder, pg. 1821; App. A-68). This contradicts Scroggins "two" Alibi's where in one she claimed that, and I quote: " Sherman let me out on 9th and left. About 3-minutes after that Treyboy pulled up and asked where was Sherman. I replied, " I don't know I thought he was with you." Treyboy said. " I'm going to see if I can find him. I'll call you later--"

In the second Alibi that Scroggins gave three months after she gave the first one, she said that Fields dropped her off and she went to her apartment. About ten  minutes later Outley knocked on her door and asked

for Fields. Scroggins said that she informed Outley that she didn't know where Fields was at and Outley told her that he was going home to her sister Alberta Hampton's house.

But later Outley would allege that he asked Fields about Coleman and Fields confessed that he'd murdered her. ( See Direct Exam. of Edward Outley, by Snyder, pg. 1830 and Cross Exam. of Edward Outley, by Fields, pg. 1846; App. A-69). However Hampton claims that Outley told her that Fields never confessed to him. ( See Alberta Hampton's Grand Jury testimony, pg. 23; App. A-70).

In the two years leading up to trial Outley had given numerous conflicting statements; In some he claim to have given Fields the alleged murder weapon and in others he swore that he hadn't given Fields a gun. Fields' only recourse was to impeach Outley where the evidence allowed for impeachment.

Attorney Scott Peterson pulled a letter from his bag at the defense table and handed the letter to Fields. Peterson told Fields to impeach Outley with the letter. The letter was from Outley to Peterson dated 10/20/02 and notarized 10/21/02. ( See Letter; App. A-71). Fields attempted to impeach Outley with the letter, and like the skillful perjurer that Outley had proven himself to be he alleged that he wrote the letter because Fields said that he was on camera at the hospital. ( See Cross Exam. of Edward Outley, by Fields, pg. 1836; App. A-72). But the letter doesn't say anything about Fields saying that Outley was on camera at the hospital, the letter say that he didn't give Fields a gun, and that somebody wanted him and/or Scroggins to lie and say that they were "with Fields"...(Whatever that means).

Prosecutor Snyder asked to see the letter and Scott Peterson gave him a copy of it. ( See Cross Exam. of Edward Outley, by Fields, pg. 1848;

25

App. A-73). Snyder nor Fields had ever seen the letter until Peterson produced it that day, but Snyder took the initiative and led Outley into perjury with a question that suggests the desired answer. stating: " Who wanted you to write this?" ( See Redirect Exam. of Edward Outley, by Snyder, pg. 1853; App. A-74). Snyder continued his manipulation stating that Outley wrote the letter because he was afraid that Fields would spread the word in the Beaumont Federal Prison that Outley was a snitch. ( Also App. A-74). But when Outley wrote the letter he was still in the county jail and had no ideal that he was going to USP Beaumont.

Attorney Scott Peterson had repeatedly witnessed the prosecution leading their witnesses into perjury so Scott Peterson approached the bench and brought it to the attention of the court. ( See Recross Exam. of Edward Outley, pgs. 1855 & 1856; App. A-75).

However, Outley wasn't afraid of being labeled a snitch, even when he was eventually sent to Beaumont Outley was still telling people that Fields killed Coleman. ( See Interview of William "Skeeter" Young; App. A-76). This is the third version of the story that Outley told. One version is that Scroggins and Hampton told him that Fields killed Coleman, Fields "approached" him, and Fields confessed. The second version is that "Bird" told him that Fields killed Coleman, Fields "called" Outley, and Fields confessed. And now the version that Outley told to William "Skeeter" Young.

Fields called William Young to the stand to verify his statement. ( See Direct Exam. of Young, by Fields, pgs. 1939-1940; App. A-77). When Mr. Young "came forward" his intentions were to make a deal with the government to testify against Fields, but since Fields was never in Beaumont USP, Young could only admit that he got his information from Edward Lee "Treyboy" Outley, a third party, therefore Young's testimony

26

could only corroborate what Fields had been saying all along; Outley and Scroggins were giving these inmates information that they were using to make deals with the government. But on cross examination prosecutor Gloff led Young into perjury claiming that Outley didn't say that he was present at the murder scene. ( See Cross Exam. of Young, pgs. 1941-1942; App. A-78).

ATF Agent Kunze was sitting at the prosecution table. Fields asked Young did he tell Kunze that Outley was present at the murder scene and Young denied it. [ See Direct Exam. of Young, by Fields, pg. 1965; App. A-79] So Fields called ATF Agent Kunze to the stand who then verified that Young did indeed tell him that Outley claimed to be present. [ See Also App. A-79]. Then on cross exam. prosecutor Gloff again led Agent Kunze into perjury claiming that Young said that he don't know Outley. [ See Cross Exam. of Kunze, by Gloff, pg. 1966; App. A-80]. But Young do know Outley. [ See Direct Exam. of Young, by Fields, pg. 1939; App. A-77]. And Outley knows William "Skeeter" Young. [ See Cross Exam. of Edward Outley, by Fields, pg. 1837; App. A-81] Outley once sold drugs for Young in the early 1990's. And someone had to tell Young that Scroggins was shot in the head twice, we know it wasn't Fields he has never been to USP Beaumont.

Fields asked Outley had the government made him any promises? [ See Cross Exam. of Edward Outley, by Fields, pg. 1847; App. A-82]. Outley lied again, claiming that the government had promised him nothing, when in fact the government had promised Outley immunity. [ See letter to Attorney Stan Schwieger from prosecutor Snyder; App. A-83].

Outley was a prolific liar that went from zero to 160 in seconds. He alleged that he was only testifying because Fields tried to make him out of an eyewitness. [ See Cross Exam. of Edward Outley, by Fields, pg. 1847; App. A-82, and Cross Exam. of Edward Outley, by Fields, pg. 1850; App.

A-84]. But that's another blatant lie. On 11/27/01 Fields wrote a letter trying to draw attention away from Outley and Scroggins stating: " For the record I haven't seen Outley since I escaped." On that same day, unbeknown to Fields, Outley wrote a statement alleging that Fields killed Coleman. So the only reason Outley would have to believe that Fields would eventually say that he was at the scene of the crime was if Outley knew that by him and Scroggins trying to put the murder off on Fields then Fields would be put in a position to where he would have to tell the truth.

In the environment where Fields lived they had this pact, if you will, amongst friends and family called " Keeping it real," where loyalty comes first. Because Fields loved Outley as if they were blood brothers Fields felt that it was his duty to protect Outley. Outley knew this and used it to his advantage so he could set Fields up for Coleman's murder.

From the outside looking in one might be skeptical, however Outley inadvertently confirmed it, in part, at his own felon in possession trial. Outley said, " You know, when you deal with the street life and coming up and even though you try to get back--You get that reputation of pride to where, you know, if--Like if I knew for sure exactly whose it was, not wanting to tell on them--so instead of looking for somebody to just point the finger at especially being at your kinfolks, you know, family member or friend, instead of pointing the finger at one of them or letting your girlfriend get in trouble, you just be a man--" [ See Direct Exam. of Outley, by Hunt, pgs. 139-140; App. A-85]. It's a bit convoluted because of the way that Outley talk, but it's also a bit cocky, if you will, because he's blatantly taunting the autnorities with the "friend" and "girlfriend" quotes; Outley's description is exactly what happened here in Fields' case; Outley, Fields' "friend", and Scroggins, Fields'

28

"girlfriend" knew that according to street code it was Fields "duty" to protect his friend and his girlfriend from the murder case.

But not only was Outley and Scroggins trying to evade a murder case, they both wanted to engage in a romantic relationship with each other and wanted Fields out of the way.
The word around the McLennan County jail was that Scroggins and Outley both were telling everyone that Fields killed Coleman. So to see if it was true Fields wrote Scroggins a letter telling her that he'd seen a letter from her to Outley stating that now that they've gotten [Fields] out of the way the two of them, [ Scroggins and Outley ] could be together. Scroggins responded: " That shit with Treyboy, come on, now. Never will I fuck my sisters man. I played with him with one letter, but not what you're talking about it said. So don't go there. I don't even do " Dark skinned guys." Not my type of hype. Oh, he was trying to get me!! He was basically fucking with you. It ain't nothing." [ See letter from Scroggins to Fields; App. A-86] But no, Outley wasn't just "basically fucking" with Fields as Scroggins so deceptively put it because Outley hadn't said anything to Fields about Scroggins.

But besides the romantic element giving Outley and Scroggins a reason to set Fields up the murder itself binded Scroggins and Outley like nothing else could; That's why every deal that Outley attempted to make with the government Outley included Scroggins. [ See letters from Outley to the prosecution; App. A-87] On the witness stand Outley had claimed that the only reason he was testifying was because Fields "tried to make him out of an eyewitness". [ See Cross Exam. of Edward Outley, by Fields, pg. 1847; App. A-82, and Cross Exam. of Edward Outley, by Fields, pg. 1850; App. A-84]. However these letters to the prosecution from Outley disproves that and exposes Outley's deceptiveness yet again. In the

letters Outley is literally begging the government to let him testify against Fields. In one letter Outley asks the prosecutor to come and talk to both him and Scroggins "at the same time". There is no doubt that Outley and Scroggins came together and concocted the storie[s] that they presented to investigators and told to the jury at trial as evidenced by the fact that they both conspired to hide the "Gold" Jaguar. In every letter to the prosecution Outley included Scroggins, and even intimated his desire to lie for the government in "future cases".

The government knew that Outley was a skilled and prolific liar. During Outley's felon in possession trial, prosecutor Gloff, in his closing argument told the jury: " So once again I ask you, what does the defendant [ Edward Outley ] say about this? It depends on which time because you just heard a fourth version today in trial. That's the fourth version of the story.

He said everybody's lying in this case except him. I want you to ask yourself, does your common sense tell you that that's what's going on, or is it simply that the defendant is trying to get himself out of a pickle? He's told three different stories, today's the fourth, and he's trying to keep it all straight." [ See Government's closing argument/ U.S. verses Edward Outley, pg. 175; App. A-88]. At sentencing Judge Smith even acknowledged that Outley was a liar and had committed perjury; And the government brought Outley to Fields' trial and presented him to the jury as if he were the Saint of all Saints while knowing that he was lying on an innocent man.

The evidence in this case strongly suggests that Outley and Scroggins both could have shot Ms. Coleman. [ See Cross Exam. of Dr. Jill Urban, by Fields, pgs. 1467-1469; App. A-89] After Scroggins shot Coleman with the gun that Scroggins got from her sister, Alberta "Na-Na" Hampton,

30

Outley either panicked or for the love of Scroggins, pulled his own gun and shot Coleman a second time. Either Outley, or Scroggins, Hampton and Outley then drug Coleman's body to where it would later be found. The huge thorn bushes at the crime scene cut one, or all of them, and their blood intertwined with Coleman's blood got in the "Gold" Jaguar. As a result they conspired to hide the Jaguar and started laying the groundwork to set Fields up for Coleman's murder.

INMATE: <u>Christian "Chae" Walker</u>

Christian "Chae" Walker and Edward Lee "Treyboy" Outley are best friends. Fields and Walker met through Outley, and were "associates" for lack of a better word.

When Walker was first arrested on a drug charge in December 2001, Walker wrote a statement saying: " I asked him [Fields] about Shining Star and he told me that she was okay and why was I asking him that--" [ See Walker's statement, dated, December 5, 2001; App. A-90] Walker wrote a second statement the next day reiterating that Fields didn't tell him that he killed Coleman. Walker wrote: " He told me that he took her back to the hospital and left, which I did not believe because I know Star. An I believe she would have called someone." [ See Walker's statement, dated, December 6, 2001; App. A-91]

Then on February 26, 2002 Walker told the Grand Jury: " I asked him about Suncerey. You know what I'm saying? He told me, " Don't worry about her; She's okay." Again, Walker went on to say that he didn't believe Fields. [ See Walker's Grand Jury testimony, pg. 14; App. A-92]

Based on that testimony the government gave Walker a time reduction, stating that his statement[s] were truthful, complete and reliable. The 5K 1  motion was filed October 18, 2002. [ See Motion; App. A-93]

That same month, October 2002 is when Fields found out that Scroggins and Outley were making plans to be together. Fields wrote Scroggins a letter telling her not to write him [Fields] anymore, and Scroggins became violently upset. She lashed out at Fields in a self-serving letter, stating, " Oh, I ain't trippin on the not writing each other anymore." She called Fields a "Bitch!" Then she said: " I've been writing Shay too so I'm gone find  out what you did w/the gun." [ See self-serving letter from Scroggins to Fields; App. A-94].

32

A year after Walker starts corresponding with Scroggins, and two days before Walker is set to testify, the prosecution approach the defense and tell them that Walker changed his story and is now going to say that Fields did indeed confess to him. ( See Cross Exam. of Walker, by Fields, pgs. 1775-1776; App. A-95) Walker then recites a story similar to Scroggins. He claim that he felt "uncomfortable" telling the truth at first because he didn't want to put his family in jeopardy. However, prior to collaborating with Scroggins, Walker had told the authorities every-thing that he could think of in order to qualify for the time reduction that the government was giving out for perjured testimony; Walker told them that Fields wanted to rob one of his [Walker's] long time friends. [ See Walker's written statement, dated December 5, 2001; App. A-96]; Walker told them that Fields wanted to rob a bank. [ See Walker's Grand Jury testimony. pg. 22; App. A-97]; Walker told them that Fields wanted to kill some guy named Reggie Hammond. [ See Walker's Grand Jury testimony, pg. 23; App. A-98]; Walker told them that he'd given Fields the .22 pistol that was found when Fields was arrested. [ See Walker's Grand Jury testimony, pg. 11; App. A-99] Walker told them that Fields "robbed people". [ See Walker's Grand Jury testimony, pg. 15; App. A-100]. And as previously stated, Walker told them that he "thought" Fields had did something to Coleman; That's not a man that "didn't want to tell the truth at first" because he didn't want to "put his family in jeopardy" like Walker now claim.

In closing Fields argued that Walker was easy to manipulate. [ See Fields closing argument, pgs. 2015-2016; App. A-101] The government countered in their argument claiming that Outley couldn't manipulate anyone. [ See Governments closing argument, pg. 2037; App. A-102]. Again, the government was being dishonest. Very early on in the case Outley

33

wrote Walker a self-serving letter telling Walker to lie and say that he gave him [Outley] the mysterious .32, but he told Walker to make a deal with the government first. [ See letter to "Shae" [Christian "Chae" Walker from Trayboy [Edward Lee "Treyboy" Outley]; App. A-103] So contrary to what prosecutor Snyder led the jury to believe, Outley can, and did manipulate Walker; Whereas Walker admits that he and Fields didn't communicate in jail; [ See Walker's Grand Jury testimony, pg. 27; App. A-104] But what's even more insane is that Walker didn't even know what kind of gun it was until Sheriff Detective Morris "Bubba" Colyer told him. [ See Walker's statement, dated January 30, 2002; App. A-105] And then Walker got an inmate right there in the jail to claim that he sold Walker the .32. [ See statement of Robert Nichols, dated January 30, 2002; App. A-106].

Fields attempted to prove that Walker got his information from Scroggins and Outley. Walker admitted that he talk to Outley, but claimed that they don't talk about the case. [ See Cross Exam. of Walker, by Fields, pg. 1777; App. A-107]. That was another blatant lie, two years prior, in the Grand Jury Walker admitted that he and Outley do talk about Fields and the case. [ See Walker's Grand Jury testimony, pg. 20; App. A-108].

On Direct examination Walker alleged that he was with Fields and Fields' cousin, Alvin "Bird" Fields and the mysterious .32 was thrown in the Brazos river. [ See Direct Exam. of Walker, by Gloff, pgs. 1767-1768; App. A-109]. Walker had given multiple statements in the past couple of years preceding the trial, and not once had he mentioned this incident, or a red Cavalier. But what's even more interesting is the fact that Outley said that he [Outley] went to his mother's house after Coleman's murder, and the same bridge that Walker claim that they were on when the mysterious .32 was allegedly discarded in the river is the same

bridge that Outley crossed to get to his mother's house. But what's even more interesting is that the river is practically Outley's mother's backyard, you can stand on the bridge and see her apartment about fifty yards away. And if you look at Walker's Grand Jury testimony, App. A-108, Walker admits that he didn't know what happened to the gun " Until Outley told him."

Walker's lies didn't stop there. He alleged that he gave Fields the .22 that Fields was Indicted for after he [Walker] got the gun from a "Kay" or "Kathy" that was dating Roger whom drove a red Grand Am. [ See Walker's Grand Jury testimony, pg. 10; App. A-110]. Yet Roger admits that he doesn't even know a "Kay" or "Kathy". [ See Direct Exam. of Roger Thomison, by Fields, pgs. 1895-1896; App. A-111]

The government was intent on placing that .22 in Fields hand, they called U.S. Marshal Parnell McNamara to the stand and McNamara lied, telling the Jury that he read Fields his rights and then Fields told him where the gun was. [ See Direct Exam. of Parnell McNamara, pg. 1556-1557; App. A-112]. Fields' attorney advised Fields to wait until the government call Hubert Steadman to the stand to impeach McNamara's testimony. It was Steadman's apartment where the gun was found. However, at the last minute the government declined to call Steadman to the stand, and since the trial was winding down it was too late for Fields to supoena Steadman. In any event Steadman had told the Grand Jury that it was he [Steadman] who told the police that Fields had a gun, the police searched for it and couldn't find it, so he [Steadman] went in the apartment and got the gun for them. [ See Steadman's Grand Jury testimony, pg. 20; App. A-113]

The truth of the matter is that Walker and Steadman thought they would get some reward money for Fields' capture, Walker told Fields to go to Steadman's apartment to get the .22, but when Fields arrived Steadman

35

claimed that he had to go get the .22 from a guy whom he'd let borrow it. Steadman left the apartment and called the police. After Fields was cornered in the apartment, Steadman, a felon himself, [ See Steadman's criminal history; App. A-114], He realized that they would want to search his apartment and if he said no it would look highly suspicious given the fact that Fields was there; The only logical solution was for him to do exactly what he did because if the police found the gun then he [Steadman] would be a felon in possession. So he told them that Fields had the gun and offered to "locate" it for them.

The evidence in regards to the .22 is clear. Law enforcement thought Coleman was murdered with that .22. [ See report from Special Agent Deborah J. Dassler; App. A-115]. It was the governments intention to "make Fields guilty" by putting that .22 in his hand. Detective Roy Davis admits to taking buccal swabs for DNA on the night that Fields was arrested. [ See Direct Exam. of Roy Davis, by Snyder, pg. 1290; App. A-116]. But they also took blood from Fields that night, which detective Davis fail to mention. At trial Davis claimed that he found Fields' blood on the handle of the .22. [ See Direct Exam. of Roy Davis, by Snyder, pg. 1294; App. A-117] Yet when Fields was arrested he didn't have no broken skin where he could have left blood on the gun.

The .32 that was alleged to have killed Coleman was said to be a revolver, the .22 was a semiautomatic that ejects bullets after being fired. Detective Davis told the jury that they were searching the crime scene for shell casings that's ejected from a semiautomatic. [ See Direct Exam. of Roy Davis, by Snyder, pg. 1288 and 1293; App. A-118]. This lends credence to the fact that they thought the .22 semiautomatic and not the .32 revolver was the murder weapon. They were so convinced that the .22 was the murder weapon they submitted the .32 bullet that was taken from the

36

victim's body to the lab twice. [ See Direct Exam. of Tim Counce, by Snyder, pg. 1520; App. A-119]

The evidence here strongly suggests that in an attempt to " Make Fields guilty " of Coleman's murder, Parnell McNamara fabricated the story about Fields telling him where the .22 was, and to obliterate all doubts detective Roy Davis took the blood that was taken when he took the buccal swabs and planted the blood on the .22. They didn't call Hubert Steadman to the stand because, although it was Steadman's apartment, and he was the one that called the police, his testimony contradicts the government's story

INMATE: <u>Jerry Reed</u>

In mid December 2002 Fields was sent to Fort Worth Federal prison pending trial. Due to his status as an escape risk he was housed in segregation and every 15-minutes the officers had to check on Fields and sign the observation sheet on the cell door.

Inmate Jerry Reed said that he was sent to Fort Worth Federal prison in January 2003. Reed said that Fields was in the cell across a 6-foot hallway from him. Reed alleged that Fields hollared across the hallway and asked him where was he from? Reed said that he told Fields that he was from Dallas, but had caught his case in Waco. Reed said that Fields said, " Do you know me? I'm Sherman Fields. I'm the one that killed my girlfriend." Reed also claimed that Fields told him that he killed Coleman, but he was going to tell the jury that Scroggins did it, and Outley and "another female" was present.

Reed admitted that he knew both Outley and Walker, but claimed that he'd never talked to them about Fields' case. But what's interesting is that from June 2002 until January 2003 Reed and Walker were cell mates. [ See Cross Exam. of Jerry Reed, by Fields, pg. 1371; App. A-120]. The letter where Scroggins said that she was writing Christian "Chae" Walker is post marked October 2002, so Walker and Reed were cell mates then when Scroggins was recruiting Walker. It's obvious that Scroggins told Walker that Fields was saying that she murdered Coleman, along with Outley and Walker passed this along to his cell mate, Jerry Reed. When Scroggins testified she told the jury that Fields "sweet talked" Coleman and "persuaded her". ( See Direct Exam. of Scroggins. by Snyder. pg. 1599; App. A-121). When Reed testified his testimony was just a distorted version of Scroggins testimony. Reed too alleged that Fields "persuaded her"

38

and "sweet talked" Coleman. ( See Cross Exam. of Reed, by Fields, pg. 1374; App. A-122)

Reed alleged that Fields called Coleman's house before he escaped and Coleman's mother told him that Coleman was at the hospital. She asked was Fields Coleman's baby daddy, and Fields said "Yes". ( See Direct Exam. of Reed, by Gloff, pg. 1367; App. A-123). Again, Scroggins was the only other person whom claimed that Fields said that Coleman's baby was his. ( See Cross Exam. of Scroggins, by Fields, pg. 1663; App. A-124). But there are several ways to determine that both Scroggins and Reed are lying. (One) Coleman's mother already knew that Fields wasn't the father of Coleman's baby. ( See Report of Investigation; App. A-125). (Two) Coleman's mother lives in Austin Texas and was nowhere near Waco and Coleman's house on the day of the murder, so Reed's story about Fields calling Coleman's house and her mother answering the phone is a lie. (Three) When Coleman had the child in August. Fields wrote a letter to Scroggins adamantly denying that he was the father. ( See letter from Fields to Scroggins; App. A-126) And (Four) Tanesha Hilliard admits that Fields never said that he thought Coleman's baby was his. ( See Cross Exam. of Tanesha Hilliard, pg. 1350; App. A-30)

The government knew that Reed was lying. Reed claimed that Fields' [codefendant] gave him a ride from the jail when he escaped. ( See Direct Exam. of Reed, by Gloff, pg. 1366; App. A-127). It's a proven fact that Fields ran from the jail to where Outley lived down the street. ( See Outley's Grand Jury testimony. pg. 8; App A-128) Reed alleged that Fields and Outley met Walker on the night of the murder, got guns and then went to the hospital. ( See Direct Exam. of Reed, by Gloff, pg. 1367; App. A-123). Again the government knew that Reed was lying, Walker didn't see Fields until about a week after the escape ( See Grand Jury testimony of

39

Walker, pgs. 5-6; App. A-129).

And the way that Reed claim that Fields confessed to him is impossible without others witnessing it; This wasn't a segregation unit where the officer's walk through periodically, in this unit there was an officer's desk sitting in the middle of the hallway between Fields cell and the cell where Reed claim he was. At all times, day and night there ere a minimum of three officers present. There was also about 60 to 80 other inmates present as well in the surrounding cells, yet no one heard this alleged confession but Reed? That's impossible!

Reed claimed that Fields told him [how many guys went to the Grand Jury], but when Fields called him on his lie he changed his story, claiming that Fields just told him that Eric Snell went to the Grand Jury. ( See Cross Exam. of Reed, by Fields, pg. 1372; App. A-130). But Eric Snell, whom is Scroggins ex-boyfriend didn't even go to the Grand Jury for Fields, Eric Snell went to the Grand Jury to provide information about the guard. Benny Garrett bringing contraband in to Snell's friend. ( See Eric Snell's Grand Jury testimony; App. A-131). Nothing Eric Snell said could harm Fields, not once did Snell say, " Fields said..." or " I saw Fields do..."
And when Reed allege that Fields told him this in January 2003 Fields didn't even have any knowledge about the case in regards to who went to the Grand Jury, that was part of the conflict between Fields and his attorney's, they wouldn't give him none of the Government's evidence. ( See Motion dated Feb. 21, 2003; App. A-10). Fields was still asking for the discovery file in December 2003. ( See letter to attorney Robert T. Swanton, notarized 12/30/03; App. A-16). And at trial January 9, 2004 Fields was still asking for the discovery file. ( See TT, pg. 13; App. A-12).

In 1988 Reed was arrested for [Making a False Report] and [False report

40

to a police officer]. ( See Reed's criminal history; App. A-132). In order to understand the significance of this we need only look to the bottom of witness statements that's taken by police. ( See warning at bottom of Scroggins handwritten statement; App. A-60). It states: " I understand if I give a false statement which is material to a criminal investigation I may be prosecuted for False Report to a Peace Officer or Law Enforcement Employee;" The same thing that Reed was charged with. Fields isn't the first person that Reed has lied on. But what's even more interesting when it comes to Reed is that there was no way to impeach him, there was no letter from Reed to the prosecution alleging that Fields confessed. there is no report of investigation. no interview, nothing! Reed just went from being cell mates with Walker when Walker was corresponding with Scroggins, to Fort Worth segregation, straight to the courtroom with a blank slate, if you will. That's very strange in a capital case where a man's life is on the line.

If we look at the facts objectively; The government went [seeking jailhouse testimony]; They tried to convince Scroggins and/or Outley to say that they were "with Fields"; Scroggins lied and said that she talked to no one but law enforcement about the case, but there's a self-serving letter from her stating that she's writing Walker in regards to the case, and at that time Reed was Walker's cell mate; We know that Reed has lied on someone else in the past; Reed has also testified against others for the government in another case. ( See Reed's Plea Bargain agreement, and Motion for Departure Pursuant to Section 5K1.1; App. A-133). And then Reed comes to court in Fields case alleging that Fields confessed to him in segregation across an expanse of at least six feet where there's anywhere from 60 to 80 other inmates present. ( See Direct Exam. of Frederick Waggoner, by Peterson, pgs. 2381-2382; App. A-134) and a

41

mimimum of three officers at all times that sit at a desk in the hallway between Fields cell and the cell where Reed claim that he was, yet none of these inmates or officers heard this alleged confession; Again. That's impossible!

The evidence suggests that Reed, a career criminal that goes around making deals with the government to testify against others, and whom knows the inmate modus operandi when making the deal, either heard that the government was [seeking jailhouse testimony], or was told directly by Walker, Scroggins, Outley, Eric Snell, Law Enforcement or prosecutor, and took what one, or possibly a combination of the aforementioned people told him about Fields and used that information to honor the deal that he made.

42

INMATE: Homero DeLeon

Homero Deleon was another inmate whom alleged that Fields confessed to him. In February 2003 Deleon wrote a letter to Prosecutor Gloff claiming that in December 2002 he was in a cell across from Fields in segregation and Fields told him that since he's not on the government's witness list to testify then Fields would confess to him. ( See letter from Deleon to Gloff; App. A-135). The government knew that Deleon was lying because when he wrote the letter there was no witness list, the governments witness list is dated, January 7, 2004  5:16 P.M.  US ATTY WDTX PROGRAMSOFFICE NO. 904 P. 2/27. ( See Witness list; App. A-136)

Almost a year after Deleon wrote that letter ATF Agent Douglas Kunze and Prosecutor Gloff went to interview Deleon. By then Deleon had been transferred to Three Rivers Federal Prison with Christian [Chae] Walker. In that Interview, dated November 13, 2003 Deleon said that he and Fields were cell mates in the jail that Fields escaped from. Again. the government knew Deleon was lying, he and Fields have never been cell mates, and as a matter of fact Fields had never seen Deleon before in his life until Deleon got up on the witness stand and lied on him at trial.

On cross examination Fields attempted to prove that he didn't know Deleon. ( See Cross Exam. of Deleon, by Fields, pgs. 1430-1433; App. A-137) Deleon claimed that he was passing Fields cigarettes by and through officer Garrett. ( See Cross Exam. of Deleon. by Fields, pg. 1431; App. A-137). However, as eager as Deleon was to testify, if he had that information in the beginning he would have certainly divulged it years earlier. In his letter to prosecutors ( App. A-135) Deleon's eagerness is evident. Deleon writes: " I was the star witness in my codefendants trial and both of my codefendants were found guilty. So in case you want me to testify against Sherman Fields and Mr. Garrett (Guard) I am more than willing to

do it."

The guard. Benny Garrett, he told on himself and made a deal with the government to testify against Fields. ( See Garrett's Plea Bargain agreement; App. A-138). Garrett's testimony took the death penalty off the table for him and landed Garrett only four years in prison. Garrett testified that he and Fields had never spoke or interacted until November 6. 2001, the day that Fields approached him about the key to the fire escape door. ( See Direct Exam. of Benny Garrett, by Gloff, pgs. 1565-1566; App. A-139). Again, the government knew that Deleon was lying, Garrett had never passed Fields cigarettes from Deleon.

Just like Reed, Deleon claimed that Fields confessed to him across the hallway in segregation with 60 to 80 other inmates present, and at least three officers, and no one heard this alleged confession, but Deleon; Again, That's impossible!

At trial Deleon claimed that in December 2002 Fields told him that Eric Snell, Jarrell Paterson, Steven Sais, Colin Alvis Smith and Andrea Sais went to the Grand Jury on him. ( See Direct Exam. of Deleon, by Snyder, pgs. 1423-1424; App. A-140). However, neither of the people that he named went to the Grand Jury on Fields. they all went to provide information on Benny Garrett; Not one of the people that Deleon named testified against Fields. In addition to that Andrea Sais wasn't even in jail and she and Fields have never met and don't even know each other, Andrea Sais' only involvement is that she was paying Benny Garrett to take her brother Steve Sais contraband into the jail, therefore it makes no sense for Fields to tell Deleon that she went to the Grand Jury on him. And just like in the case of Jerry Reed, the notarized motion to the court, dated Feb. 21, 2003 telling the Courts that Fields' attorney's were not giving him any evidence in relation to the case proves that

44

Fields didn't even know who went to the Grand Jury when Deleon claim. ( See Motion; App. A-10)

Prosecutor Gloff called ATF Agent Douglas Kunze to the stand to defraud the jury by adding false substance to Deleon's testimony alleging that they gave the defense the Grand Jury transcripts [early on in the investigation]. ( See Exam. of Douglas Kunze, pgs. 1876-1889; App. A-141). But in December 2002 when Deleon claim that Fields told him this, Fields or his attorney's didn't even have the transcripts like agent Kunze misled the jury to believe, and the government knew that. On July 30, 2003. seven months after Deleon claim that Fields told him the stuff about the Grand Jury. Fields' attorney's was still asking the government for the Grand Jury transcripts. ( See letter from Attorney Scott Peterson to Prosecutor(s) Snyder and Gloff, dated July 30, 2003; App. A-142). And Fields himself was still asking for the Grand Jury transcripts all the way up past December 30, 2003; ( See letter to Attorney Robert T Swanton, notarized 12/30/03; App. A-16).

Fields asked Deleon do he know the people whom he allege that Fields told him went to the Grand jury and at first Deleon lied and said no, but as Fields continued that line of questioning Deleon admitted that he knew all of them. ( See Cross Exam. of Deleon, by Fields. pgs. 1434-1435; App. A-143).

It's obvious that one, or all of these people told Deleon that they went to the Grand Jury and Deleon assumed that it was for Fields and incorporated this into his story. Deleon's story, in part can be traced back to Chris Walker as well. Deleon alleged that Fields told him that he went back to the murder scene and drug the body under a tree because it was raining. ( See Direct Exam. of Deleon by Snyder. pg. 1428; App. A-144). Yet a guy named Casey Leon Forge alleged the same thing claiming

45

that Christian [Chae] Walker told him. ( See Report of Investigation; App. A-145). Forge, Walker and Deleon was all at Three Rivers Federal Penitentiary together when these stories came out. Also, if you look at the crime scene photo's the only way the body could not have already been up under a tree was if the body was lying out in the middle of the road. ( See Crime scene photo's; App. A-146).

There is a mountain of evidence herein that proves Deleon is lying and the government knew it. However Deleon came up with the story that he concocted, whether it was by and through Scroggins ex-boyfriend Eric Snell, Chris Walker, or someone else it's clear that Fields didn't tell Deleon the things that he allege. Not only does it not makes sense but some of Deleon's allegations are downright impossible  It only lends credence to the fact that the government went [seeking jailhouse testimony].

---

( NOTE ):

The guy Casey Leon Forge didn't testify at trial, but to be clear we would like to address what he said. First of all, Fields don't know Forge, have never met him and was never in a tan car with Walker like Forge claimed. As far as the letter to Walker that Forge claim to have seen, even Walker admits that he and Fields didn't communicate while they were incarcerated, and every letter to and from Fields, incoming and outgoing was inspected and copied. ( See Cross Exam. of Jimmy Stone, by Fields, pgs. 1807-1808; App. A-147).

46

INMATE: Kevin Lamar Burton

Kevin Lamar Burton was another inmate that "came forward" in late 2003 while he was in Three Rivers Federal Prison with Christian [Chae] Walker, Homero Deleon and Casey Leon Forge. Burton wrote a letter to the prosecution claiming that two years prior, while Fields was out on escape, he confessed to him. ( See Burton's letter; App. A-148). Burton alleged that Fields told the guard that he would give him $10,000 to escape. The government knew Burton was lying, even Benny Garrett testified that Fields offered him $5,000. ( See Direct Exam. of Garrett, by Gloff, pg. 1567; App. A-149). The government even acknowledges that the amount was $5,000 in all of their documents. The only other person that said Fields offered the guard $10,000 is Shalaykea [Lakie] Scroggins. ( See Scroggins Grand Jury testimony, pg. 30; App. A-150).

Burton said that Fields got a gun from his cousin Shey before he called Coleman at the hospital. ( Also App. A-148). Again the government knew that Burton was lying, [Shey], or Christian [Chae] Walker isn't related to Fields, nor was Walker even seen at all on the night of the murder. ( See Walker's Grand Jury testimony, pgs. 5-6; App. A-129).

Burton alleged that Fields told him that he called Coleman at the hospital to say he wanted to talk and to meet him in the parking lot, and once she got in the car he drove off with her. ( See App. A-148). Again the government knew that was a false statement, Coleman didn't leave with Fields the first time when he called the hospital, Coleman left with Fields the second time when he went in the hospital to get her. ( See Report of Investigation; App. A-151).

Just like other inmates that testified and/or attempted to make deals to testify against Fields, Fields had never met or even seen Burton before until he came to court and lied on Fields. On cross examination

47

Fields tried to establish this. ( See Cross Exam. of Burton, by Fields, pgs. 1387-1390; App. A-152).

Burton alleged that Fields confessed to him on Friday November 16, 2001. ( See Direct Exam. of Burton, by Snyder, pgs. 1380-1381; App. A-153). Burton said that he was sure the date was November 16th. ( See Cross Exam. Of Burton, by Fields, pg. 1395; App. A-154). Burton alleged that Fields was in a [four door] red Grand Am. ( See Cross Exam. of Burton, by Fields, pgs. 1392-1393; App. A-155). Burton also said that around this time he saw Edward Lee [Treyboy] Outley in a jaguar. ( See Report of Investigation; App. A-156). But first of all, the Grand Am was a two door, not a four door, and it went to the forensics lab on November the 13th, so Burton couldn't have possibly seen Fields in that car on November the 16th. ( See Waco PD Supplement Report; App. A-39). Nor could Burton have seen Outley in the "jaguar" around the same time, that's impossible. Outley was arrested on November the 13th. ( See Summary of reports, by Casson; App. A-157). And it's a proven fact that neither the Grand Am or the Jaguar was no longer in the picture after the night of the murder.

It's obvious what happened here, Someone told Burton that the murder happened on the 6th and Burton thought they said the 16th, or the person that told him got the date wrong and told Burton that it was the 16th, and Burton, just like the other inmates seeking that time reduction for perjured "jailhouse testimony" concocted a story that would qualify him.

Fields attempted to impeach Burton on his decision to [come forward] two years after the fact while Burton was in Three Rivers federal prison with Christian [Chae] Walker, and like all "witnesses" trying to justify their lies, Burton alleged that he was afraid of Fields. ( See Cross Exam. of Burton, by Fields, pg. 1386; App. A-158). However Burton's criminal record doesn't reflect that of a fearful individual. ( See Burton's

48

criminal history; App. A-159); Everything from assault, to aggravated robbery, to unlawfully carrying a weapon and drug charges. But prosecutor Gloff immediately pounced on Burton's comment about being afraid, and led Burton into saying that Fields tried to rob him. ( See Redirect exam. of Burton, by Gloff, pg. 1391; App. A-160). Nowhere in either of Burton's statements had he ever said that he was afraid of Fields and/or Fields tried to rob him. Prosecutor Gloff took it a step further and led Burton into saying that Fields was known to shoot and rob crack dealers. ( See Redirect exam. of Burton, by Gloff, pg. 1404; App. A-161). Fields tried to show the jury how ludicrous Burton's testimony was. ( See Cross exam. of Burton, by Fields, pg. 1392; App. A-155). Burton alleged that Fields was going to rob him and then all of a sudden Fields just came out and said that he killed Coleman and explained it to Burton. On Direct appeal to the 5th Circuit, Fields argued that not only was Prosecutor Gloff's actions a 404(b) violation, but it was also prosecutor misconduct. The 5th Circuit erroneously held that the prosecutor did nothing wrong because Fields had said that Burton fabricated his testimony. ( See 5th Circuit opinion, pgs. 39-40; App. A-162). However, the evidence is in support of Fields, showing that Burton did indeed fabricate his testimony.

Even as the trial progressed Burton continued to lie. Fields asked Burton was he anticipating a time reduction and he said no. ( See Cross exam. of Burton, by Fields, pg. 1399; App. A-163) But in the interview ( App. A-156 ) Agent Kunze documented that Burton said that he came forward to "help himself". And when the prosecution asked Burton was he anticipating a time reduction, Burton said yes. ( See exam. of Burton, by Gloff, pg. 1382; App. A-164)

Burton, just like Reed and Deleon had already testified against other people and received a time reduction. ( See Plea Bargain agreement,

Governments motion for Downward Departure and the order granting the deal; App. A-165). It's obvious that Burton got his information by and through Christian [Chae] Walker and the other inmates that was in Three Rivers with him when he "came forward", Outley, Scroggins and/or the coaching of police and prosecutors, and concocted this story about Fields confessing to him two years prior. There is no way possible that Burton saw Fields in a "four door" Grand Am, and saw Outley in "a jaguar" on November the 16th; Burton is just a product of the government "seeking jailhouse testimony".

INMATE: John Allen Mercer

John Allen Mercer was a fifty year old racist, terrorist, pedophile. He first wrote the government a letter in February 2002 alleging that because there are no TV's and newspapers in segregation Fields confessed to him. ( See letter from Mercer to prosecution; App. A-166). But at trial Mercer changed his story, he said that Fields wasn't talking to him, but rather he heard Fields confessing to "other people". ( See Direct exam. of Mercer, by Gloff, pg. 1478; App. A-167). Mercer testified that Fields "got Coleman from the hospital, took her out and busted a cap on her because she was "supposed to be having an affair". Mercer said that she was either killed with a .22 or a nine, and that when Fields escaped "he had a key", he went out the fire escape", and "supposedly jacked somebody for their car". ( See Direct exam. of Mercer, by Gloff, pg. 1477; App. A-168). But contrary to the lie that Mercer told in his letter to the prosecution there are TV's in Administrative segregation where Mercer was housed in protective custody prior to Fields' arrival. And there are newspapers in segregation. It's obvious that Mercer tried to distance himself from these sources of information since his testimony is painfully similar to media reports. Mercer told the jury: " He said that he got her from Hillcrest Hospital and took her out and busted a cap on her."; The Waco Tribune Herald, December 12, 2001 gave Mercer that information. ( See December 12, 2001 newspaper article; App. A-169). When Gloff had asked Mercer did Fields say why he had "busted a cap in her", Mercer said, " No. Only thing I know is that she was supposed to be having an affair while he was locked up." ( See App. A-168). So if Fields didn't tell Mercer that then the only way Mercer could have known that Coleman was "having an affair" was if Mercer had obtained that information from someone other than Fields, or Mercer got it from the

media. ( See Waco Tribune Herald, November 10, 2001; App. A-170). The newspaper quotes Coleman's mother as saying, " I think he was angry because she had a baby by another man." That statement would account for Mercer's " She was having an affair " statement.

Mercer told the jury that Fields had a key and went down the fire escape. The newspaper gave him that information as well. ( See Waco Tribune Herald, November 27, 2001; App. A-171).

Mercer also told the jury that Fields "carjacked a woman"; The newspaper also gave him that information. The newspaper articles ran consistently for over two years and became more and more detailed. There is no doubt that Mercer and the other inmates utilized the media when concocting their storie(s). However, there's another way that Mercer could have gotten his information. When Mercer was in segregation prior to Fields' arrival, Shalaykea [Lakie] Scroggins was already telling everyone in jail that Fields killed Coleman. ( See Incident report; App. A-172). When Scroggins cell mates told the authorities that Scroggins said that Fields was going to "bust her out of jail" the authorities locked Scroggins in segregation where Mercer was being housed.

It would have been impossible for Fields to confess to anyone in segregation at the Highway 6 jail in Waco, Texas, the standard of living there was even more intense for Fields than it was in Fort Worth. Fields was in 4-cell, only two cells away from where the officers desk was located and because Waco, Texas is where the crime was committed and they were desperate for information they listened to every word that Fields said. Every fifteen minutes they were at Fields door signing the 15-minute check sheet on his door, they monitored his mail, he was up under such scrutiny and security Fields couldn't have confessed to anyone like Mercer claimed, especially out in the open yelling from one cell to

another. The officers that were always present and the other inmates would have definitely heard a confession, the government knew that Mercer was lying.

Prior to Fields going to jail Mercer wrote Judge Smith a letter threatening to kill him and his family and blow up various federal buildings. ( See letter from Mercer to Judge Smith; App. A-173). Mercer signed the letter with lightening bolts, the sign of the skin heads, a white supremacist group. Mercer claimed that he wasn't racist, but rather for the " betterment of his people." ( See Cross exam. of Mercer, by Fields, pgs. 1483-1484; App. A-174). However, the skin heads is a racist group that hate minorities. How is it that it's a violation to let a racist juror sit and judge you, but not a violation to let a racist inmate that's obviously lying, testify against you?

On Redirect prosecutor Gloff said that Mercer just wrote the letter because he was "mad about something". ( See Redirect exam. of Mercer, pgs. 1486-1487; App. A-175). And then the prosecution said that the government hadn't promised Mercer anything. ( Also App. A-175). But that too is deceptive. John Mercer was in jail for sexual assault on a child. ( See Direct exam. of Mercer, by Gloff; pg. 1475; App. A-176). At the time he was on parole with a Life sentence. ( See Direct exam. of Mercer, by Gloff, pg. 1476; App. A-177). Mercer admits that three convictions will get you a life sentence, and after going to prison four times and one previous life sentence Mercer was guaranteed another Life sentence for raping the child; How did he get 25-years if there was no deal? And on top of that the charges for threatening to kill the Judge and blow up federal buildings were dropped.

The evidence here strongly suggests that Mercer got his information from the newspaper, or somewhere other than Fields.

53

INMATE[S] <u>Christopher Quigley & Dominique Tubbs</u>

Christopher Quigley and Dominique Tubbs were in the cell with Fields when Fields escaped on November 6, 2001. Their storie[s], just like the other inmates were all over the place.

At 1:00 A.M. right after Fields escaped Tubbs and Quigley were separated and they were interviewed. [ See Report of Investigation; App. A-178 ]. Tubbs nor Quigley could provide no useable information.

At 6:00 that evening U.S. Marshals Sheely and Shaddix flew in from Austin, Texas and reinterviewed Tubbs and Quigley. [ See Report of Investigation; App. A-179 ]. Tubbs nor Quigley still could provide no useable information.

Then two days after talking to Edward Lee [Treyboy] Outley, a detective named Steve January, whom essentially had nothing to do with Coleman's murder, goes out to the jail to "reinterview" Tubbs and Quigley; This time he walks away with two statements that he wrote for them alleging that Tubbs and Quigley heard Fields threaten Coleman on the phone. [ See Tubbs and Quigley's statements; App. A-180 ].

Fields attacked Quigley's forever evolving story. In Quigley's statement in [ App. A-180 ] Quigley alleges that Fields said that if he caught any guy over to Coleman's house " he would spray him." Then at trial Quigley alleged that Fields said that " he would spray her." [Coleman]; [ See Direct exam. of Quigley, by Snyder, pg. 1222; App. A-181]. Fields attempted to get the jury to see the contradictions. [ See Cross exam. of Quigley, by Fields, pgs. 1232-1234; App. A-182].

Fields established that he and Quigley had had several verbal altercations. [ See Cross exam. of Quigley, by Fields, pgs. 1228-1229; App. A-183]. Then Fields said, " So we're not friends or associates or nothing like that, but I'm going to come and converse with you and tell you that I'm fixing to go kill my girl?" [ Also App. A-183 ]. Quigley

said that Fields didn't tell him that, but again he was contradicting his own testimony. On February 26, 2002 Quigley told the Grand Jury that Fields did indeed tell him that he was going to kill Coleman. [ See Quigley's grand jury testimony, pgs. 9-10; App. A-184].

In order to grasp the depth and scope of Quigley's deception we'll have to delve into his friend, Dominique Tubbs testimony. Quigley alleged that Fields and Coleman would fight on the phone " all the time." [ See Quigley's grand jury testimony, pg. 7; App. A-185]. Tubbs alleged that it only happened once. [ See Tubbs grand jury testimony, pg. 7; App. A-186].

At trial Snyder asked Tubbs did Fields threaten to kill Coleman when he was off the phone, and Tubbs said no. [ See Direct exam. of Tubbs, by Snyder, pg. 1207; App. A-187]. When Quigley went to the Grand jury, Gloff had asked him: " Okay, and then when he would get off the phone would he make comments to you all about what he was going to do?" Quigley said, " All the time." [ See Quigley's grand jury testimony, pg. 9; App. A-184].

The two contradictory statements is very significant. The cell was a small, four man 8 X 10 or 8 X 12, it's impossible for one inmate to hear these " off the phone " threats and the other one didn't, if it happened at all, let alone " all the time," like Quigley claim.

Tubbs alleged that the one incident where he claim that Fields threatened Coleman was when Scroggins told Fields via telephone conversation that Coleman was " on Crenshaw bopping." [ See Cross exam. of Tubbs, by Fields, pg. 1210; App. A-188]. But Tubbs, on direct examination makes a stunning admission, he said that Fields didn't express his anger to him about the situation. [ See Direct exam. of Tubbs, by Snyder, pg. 1207; App. A-187]. So it begs the question: If Fields didn't express his anger to Tubbs, how did Tubbs know that Scroggins supposedly said that Coleman was " on Crenshaw bopping?" That's impossible since Tubbs is

claiming that he heard a one-sided conversation.

Fields asked Tubbs what did he tell the Marshals when he and Quigley were interviewed the first time on November 7th, right after the escape? Tubbs claimed that he couldn't remember. [ See Cross exam. of Tubbs, by Fields, pg. 1211; App. A-189]. Fields asked Tubbs if he told them that he escaped to go kill Coleman, and Tubbs said that he told them that that was probably Fields' plan.

There was no formal statement in the file of those first two interviews only a record that the interviews took place. Fields picked up a piece of paper and pretended to be reading the statement.

" So you said that you told the U.S. Marshals on November 7, 2001, the day after my escape, that I was going to kill Shining Star?" Fields said.

" I ain't just exactly say you going to kill Shining Star," Tubbs said, changing his story. " But I told them that you planned the escape and how you were going to rob a bank and all that."

" No, that's not what I asked you, Mr. Tubbs, I asked you did you tell them that I was going to kill Shining Star?" Fields said.

" It's been so long I can't remember," Tubbs said.

[ See Cross exam. of Tubbs, by Fields, pgs. 1212-1213; App. A-190].

It's obvious that Tubbs is lying. How is it that he can't remember that, but he remembered everything that was written in the statement that Detective January wrote for him only eight days later?

Snyder was quick to point towards the November 15th statement, he wanted to give the jury the impression that Fields had to have threatened Coleman because Tubbs said that Fields threatened to kill her before her body was found. [ See Redirect exam. of Tubbs, by Snyder, pg. 1214; App. A-191].

56

Tubbs claimed that he didn't know that Coleman was dead until he read it in the newspaper. [ See Recross exam. of Tubbs, by Fields, pg. 1217; App. A-192]. That was a blatant lie. Quigley confirmed that " a police officer " told him AND Tubbs that Coleman was deceased " while Fields was still out on escape status. [ See Cross exam. of Quigley, by Fields, pg. 1231; App. A-193]. That's extremely significant because the only day that Tubbs and Quigley talked to a police officer " while Fields was still free ", besides the November the 7th interviews, is November the 15th, the day that homicide detective Steve January wrote the statements for them right after he talked to Edward Lee [Treyboy] Outley.

And as for Tubbs' claim that he didn't know that Coleman was deceased until he read it in the newspaper; The newspaper article announcing Coleman's death came out on December 12, 2001, and Fields was " No longer free " then. [ See Waco Tribune Herald; App. A-169].

Snyder took full advantage of Fields' inexperience and led Quigley into perjury claiming that Quigley and Tubbs weren't interviewed on November 7, 2001, but rather December 7th. [ See Redirect exam. of Quigley, by Snyder, pgs. 1238-1239; App. A-194]. But as you've seen in App.178 and App. 179 they were interviewed on November the 7th. And it also list November the 7th on the report. [ See Report; App. A-157 ]. And the December interviews of Tubbs and Quigley were on December the 5th, and the interview was done by Prosecutor Gloff, not the police. But most importantly Quigley said that a police officer told him and Tubbs that Coleman was deceased " while Fields was still free," Fields was no longer free in December and had been back in jail since November 24th. However, the time line tells the story:

November 7, 2001: Fields' cellmates separated at 1:00 a.m. and interviewed by Waco Sheriff's Detective's; Tubbs nor Quigley could provide no useable information.

November 7, 2001:  Fields' cellmates reinterviewed by U.S. Marshals from Austin, Texas, Sheely and Shaddix; Tubbs and Quigley still could provide no useable information.

November 13, 2001:  Detective Steve January talks to Edward Lee [Treyboy] Outley, the guy that's going around with Scroggins telling everyone that Fields killed Coleman.

November 14, 2001:  Detective January receives information from at least two unknown sources claiming that Fields murdered Coleman.

November 15, 2001:  Detective Steve January reinterviews Fields cellmates. This time he walks away with statements that he wrote alleging that Quigley and Tubbs heard Fields threaten Coleman.

January 29, 2004:  During trial Tubbs claims that he didn't know that Coleman was deceased until three weeks after her body was found when he read it in the newspaper. But his friend, Chris Quigley inadvertently admits that he and Tubbs both knew that Coleman was deceased before her body was found because a police officer told them during the time that Fields was still out on escape status.

It's obvious where Tubbs and Quigley got their testimony from; Steve January. It's obvious that they were coached. Even Scroggins admits that it was she and Fields that argued " all the time," yet Tubbs nor Quigley said that Fields argued with Scroggins. In addition to that, if Fields would have really threatened to kill Coleman, Coleman's cousin Tanesha Hilliard would have known because she and Coleman was literally together every day, and Hilliard admits that she's never known Fields to be violent towards Coleman.

DETECTIVE: <u>Steve January</u>

Detective Steve January, a homicide detective with the Waco Police Department, and whom has a long history with Fields "took an interest in the case" although it had nothing to do with him. ( See Direct exam. of January, by Snyder, pg. 1317; App. A-195). January claim that the US Marshals needed assistance in the city limits, but the Marshals were already being assisted by the Mclennan County Sheriff's office, whom also has jurisdiction in the city limits.

The evidence suggests that Detective Steve January "took an interest in the case" to make sure that Fields was convicted by any means necessary. January wrote and filed reports in relation to everyone that he talked to but he neglected to file a report in relation to his contact with Edward Lee [Treyboy] Outley. Instead January attempts to distance himself from Outley by first writing a report alleging that he wasn't there when Outley was arrested on November 13, 2001, stating that the next day, November 14, 2001 at 1:30 AM he received a phone call from US Marshal Parnell McNamara who told him that they had arrested Outley. ( See Continuation page; App. A-196). But at trial two years after January filed the aforementioned report he forgot that he'd said that he wasn't there and admitted that he was indeed there. ( See Cross exam. of January, by Fields, pg. 1333; App. A-197). Fields asked January was he the first one on the scene and again January lied, attempting to keep that barrier between him and Outley. January claimed that the Marshals was there first and they called him over there. ( See Cross exam. of January, by Fields, pg. 1334; App. A-198). But a report filed by U.S. Marshal Chris Casson states that " On 11/13/01 at approximately 1430 hours, U.S. Marshals Waco received information from the waco Police Department that Fields had been seen at 1100 N. 6th, Waco, TX (apartment complex). Upon arrival, DUSM's encountered Waco Police Detective Steve January speaking with

59

Edward Outley (DOB: 04/19/74 in front of apartment G-2". ( See Report of Investigation; App. A-199). Also during Outley's Felon in possession trial Outley testified that Detective Steve January held him up until the Marshals arrived. ( See Direct exam. of Outley, pg. 134; App. A-200)

It's obvious that Detective Steve January is trying to hide the fact that he talked to Outley just two days prior to going out to the jail and writing the statements for Tubbs and Quigley.

With the rumors floating around about Coleman's death, January, a homicide detective, wanted and/or needed to jumpstart the murder investigation in the event the rumors proved to be true. After Outley told January that Coleman was deceased and alleged that Fields had killed her, January, knowing that criminals will say anything if you make a deal with them, went out to the jail on November 15th and wrote the statements for Tubbs and Quigley alleging that they heard Fields threaten Coleman after they'd been interviewed twice already but could provide no useable information.

But detective January's deception doesn't stop there. Prosecutor Snyder led January into a series of questions about several vehicles that Fields drove or was thought to have driven while he was out. Of particular interest was the Chevrolet Lumina that Fields was charged with carjacking. ( See Direct exam. of January, by Snyder, pg. 1324; App. A-201). January testified that the Lumina was clean, there was nothing there. ( See Direct exam. of January, by Snyder, pg. 1326; App. A-202). That was a blatant lie, there were twelve latent prints, all of AFIS quality. ( See Supplement report(s); App. A-203). These prints were checked against Fields and Christian [Chae] Walker's prints and there was no match. ( See Supplement report; App. A-204).

A review of the record and corresponding documents reveal the depth of detective January's deception. From the outside looking in it appears

60

that January "solved" a significant portion of the case(s) against Fields. January was able to get Tubbs and Quigley to say that they heard Fields threaten Coleman after U.S. Marshals and McLennan County Sheriff's came up with nothing. And January "found" the alleged carjacking vehicle. However, January's attempts to distance himself from Outley and the blatant lies that he told in regards to his involvement with Outley, and his perjured testimony on the stand in regards to the fingerprints found in the Lumina reveals a darker side of detective January, an alter ego that's a lot more sinister than the "extraordinary cop".

<u>TAMMY EDWARDS</u>

Tammy Edwards was a middle age white female whom alleged that on 11/15/01, as she was getting out of her car at the hospital an unknown black male took her car at gunpoint. ( See Tammy Edwards statement; App. A-205). A police officer named Carrizales tries to bolster Tammy Edwards statement, claiming in his report that Edwards said that she [Thinks] she saw the black male on TV. ( See Continuation page; App. A-206). But as noted, Edwards doesn't say anything about seeing the black male on TV in her written statement, she even contradicts officer Carrizales' statement about her having bandaids on her hand. ( See Deposition; pg. 119; App. A-207).

In December 2003 Tammy Edwards changed her story yet again, this time she alleged that she knew it was "Fields all along" because his picture was posted up all over the hospital. ( See Deposition; Pg. 96; App. A-208). This also contradicts officer Carrizales statement ( App. A-206 ) where he states: " I asked Ms. Edwards if she was able to recognize the man at the time of the robbery as being the guy off of the TV and she said she was not able to do this right away since she had never been in personal contact with him, only that he looked familiar; however, she did not know who he was until the security guard and I had showed her a picture of the subject.

It's obvious that, if Edwards car was indeed jacked, her identification of the perpetrator was influenced by prejudice. She said a security guard just busted in yelling, " Did you see Sherman Fields! Did you see Sherman Fields!" ( See Deposition, pg. 103; App. A-209). And in addition to that, Edwards assertion that she knew that it was Fields all along because his picture was posted up around the hospital is flawed; We have reason to believe that Fields' picture wasn't posted up around the hospital until "After" the alleged carjacking, that's why the security

62

guard had to show Tammy Edwards a picture of Fields out of the newspaper. ( See Deposition, pg. 105; App. A-210). It's obvious that Edwards story is contrived. At trial Fields asked her to describe how the subject wore his hair and she said " Shorter than you have it now." ( See Cross exam. of Edwards, by Fields, pg. 1739; App. A-211). But how would she know how the alleged perpetrator wore his hair when Edwards previously said that the subject was wearing a hat and she couldn't have saw his hair? ( See Continuation page, App. A-206). Then she testified that she never said that the subject was wearing a hat. ( See Cross exam. of Edwards, by Fields, pg. 1739; App. A-211).

The lies didn't stop there, two years after the fact Tammy Edwards said, " Oh, he shot at me too." ( See Deposition, pgs. 99-100; App. A-212). Neither her written statement or the police reports state that the subject "shot at her". Even Detective January admitted that she'd never said that the subject "shot at her".

When Tammy Edwards wrote her written statement on the day of the alleged incident, she wrote, " I was screaming and yelling for help the entire time." ( See Tammy Edwards statement; App. A-205). Two years later Edwards said that she couldn't scream. ( See Deposition, pg. 118; App. A-213).

Tammy Edwards contradicted her own statement and every police report that was written. It's shift change at a huge major hospital with people coming and going, a carjacking is taking place amid a struggle and yelling and screaming and a gunshot, according to Tammy Edwards, yet no one saw or heard anything but Tammy Edwards? That's impossible! The evidence suggests that Tammy Edwards conspired with one or more of the government witnesses to fabricate evidence in order to give the governments case false substance, and/or to sue Civigenics, the company that ran the jail that Fields escaped from.

63

At trial Fields asked Edwards were she ever shown a picture of Chris Walker and Edwards claimed that she didn't know who Chris Walker was. ( See Cross exam. of Edwards, by Fields, pgs. 1741-1742; App. A-214). When Edwards took the deposition she admitted to dating a "Chris", but claimed that she didn't know his last name. ( See Deposition, pgs. 56-57; App. A-215) When Fields asked Edwards was she informed that Chris Walker was living where they found her car, prosecutor Snyder objected saying that it wasn't true. ( See Cross exam. of Tammy Edwards, pg. 1742; App. A-214). But it was true. ( See Walker's Grand Jury testimony, pg. 21; App. A-216). And Snyder knew it was true because that's where Walker was arrested at. ( See Report of Investigation; App. A-217). Snyder just chose to mislead the jury and make them believe that it was Fields whom was being deceptive.

But Tammy Edwards involvement with Chris Walker shouldn't come as a surprise being that Edwards has a history with hardened criminals. She's married to a black man named Daryl Edwards, Mr. Edwards robbed an elderly couple and murdered the woman. ( See Deposition, pgs. 37-39; App. A-218). At the time of the alleged carjacking Tammy Edwards was still driving four hours to and from the prison to visit Daryl Edwards on the weekend. She claimed that the only reason that she went was because her son that she have with Mr. Edwards wants to see his father, but at this stage everyone is use to Tammy Edwards excuses and blatant lies. In December 2003 Edwards alleged that the carjacking had essentially left her mentally and emotionally impaired, and at or about four months prior to December she was just getting back in the groove, if you will. ( See Deposition, pgs. 127-128; App. A-219); Which would be understandable if she had really been carjacked, and was suffering the after effects of it. But a report that Civigenics attorney, Jeff Richardson obtained from her job shows that Tammy Edwards flourished from the time before the alleged carjacking,

continuous. ( See Associate Evaluation form; App. A-220, and Deposition pgs. 138-139; App. A-221)

The evidence suggests that Tammy Edwards used Fields' unfortunate situation to scam civigenics for money. During the Deposition Tammy Edwards told Attorney Jeff Richardson that she wanted to go to college. When he asked her how do she plan to finance that, Edwards said, " I hope to win and use that money to put me through college." ( See Deposition, pg. 133; App. A-222). She was talking about the lawsuit she filed against civigenics for Fields' escape.

From the very beginning the whole carjacking case was one big lie; U.S. Marshal Chris Casson lied to the Grand Jury so they would return the indictment, claiming that Fields had relatives near the hospital and he might have been staking it out, and he could run to his relatives house should the carjacking go wrong. ( See Casson's Grand Jury testimony, pg. 19; App. A-223). Fields' mother lived on 21st and Lyle street, the hospital is on 31st and Herring Avenue, definitely not close enough to "stake out", or "run to" should a carjacking go wrong. And it's a proven fact that Fields was never at his mother's house, there was a 24-hour surveillance team watching the house. As for there being other "friend" and "relatives" in the area, that too is a blatant lie, the people that live around that hospital are upper and middle class white families. At trial Casson tried to lie and Fields was present this time to challenge his perjury. ( See Exam. of Chris Casson, pgs. 1868-1870; App. A-224). Casson's blatant act(s) of perjury signifies the governments entire case against Fields, perjury that's imposed willfully and maliciously in order to trick both a Grand Jury and a trial jury into returning an indictment, a guilty verdict, and a death sentence.

Tammy Edwards was the only "witness" at trial to the alleged carjacking.

## CHANCE ALEXANDER

Chance Alexander was a guy that investigators for the prosecution had attempted, with and without success to recruit to aid their conspiracy to murder Fields. At First Alexander agreed to help them, but somewhere along the way Alexander admitted that he lied, and in fact didn't even know Fields. He said that he'd agreed to lie because he was told that he would be let out of jail. ( See Direct exam. of Chance Alexander, pgs. 1930-1931; App. A-225). On cross exam. Prosecutor Gloff made several deceptive suggestions. ( See Cross exam. of Alexander, by Gloff, pgs. 1932-1935; App. A-226). First Gloff insinuated that just because Alexander had said that Fields killed Coleman and shot her in the head [twice] Fields must have told him. But that's just like Misty Smallwood said that Coleman was shot in the head [twice], " After Scroggins told her." (See Misty Smallwoods statement; App. A-227). Misty Smallwood, whom didn't know Fields either, just like these other crooks had made assumptions about Fields based solely on what Scroggins told her.

And again, like William Young, whom also said that Coleman was shot in the head [twice] " After Outley told him." [ See cross exam. of Young, by Gloff, pg. 1942; App. A-78].

Then Gloff insinuated that the government had nothing to do with the deals being made, saying, " This is a federal case. No one from the government agreed to get you out of jail." However, Gloff knew that the bulk of their case was investigated by non-government officials; [i.e] Detective Steve January; Detective Morris [Bubba] Colyer; Detective Johnny Spillman; Detective Roy Davis; Detective Jimmy Stone are all State and County officials. Chance Alexander said that it was a man named "Robertson", coincidentally there's a "Robertson" with the Sheriff's department. And the government knew exactly who from the

66

government contacted Mr. Alexander, it was Prosecutor Gloff, himself. [ See letter to Alexander, from Gloff; App. A-228 ].

Then Gloff attacked Alexander for lying about his name when he was arrested three years earlier. However, Gloff knew Alexander had lied about his name when they were going to use him to lie on Fields. But what's even more interesting is that Chris Walker lied about his name. [ See Report of Investigation; App. A-217]. Kevin Burton was arrested twice for lying about his name. [ See Burton's criminal history; App. A-159]. Jerry Reed filed a false report on someone. [ See Reed's criminal history; App. A-132]. Now when Chance Alexander admits that he lied because they promised to let him out of jail, and in reality he doesn't even know Fields, the government attacks him about something that they already knew when they were going to use him to lie on Fields? That's being dishonest.

Summary: <u>ARGUMENT & LEGAL AUTHORITY</u>

Mr. Fields' conviction[s] and Death Sentence violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because he is actually and factually innocent.

" By the protections of the law, human rights are secured; withdraw that protection and we are at the mercy of wicked rulers, or the clamors of an excited people; Walberg v. Israel, 766 F.2d 1071, 1078 [7th Cir.] [Posner, J.], cert. denied, 474 U.S. 1031 [1985]. It's obvious here in Fields that prosecutorial vindictiveness and intense [one-sided] media · scrutiny led to the conviction and impending death of Mr. Fields. In Herrera v. Collins, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L. Ed. 2d 203 [1993], Justice Blackman said that [t]he execution of a person who can show that he is innocent comes perilously close to simple murder; In Fields, his impending demise exceeds that and delves into the territory of premeditated murder. Fields had no ideal that Scroggins and Outley were planning on murdering Coleman, and didn't participate in her murder in any way. The evidence herein shows a concerted effort on behalf of the government to make the case into something that it wasn't/Isn't, so they could murder Fields via lethal injection. There has been a grave distortion of the truth on the government's part, and a failed and/or reckless disregard of the truth by the courts; They've failed to distinguish the factual elements between Fields' story and the government's story. The government's case is ".word of mouth," if you will, and just like Fields said at trial, just because someone say it, it doesn't mean that it's true. On the other hand, herein this Freestanding Actual Innocence petition, by and through " physical documents " Fields proves that [1] There emerged a conspiracy to frame, convict and murder him via lethal injection; [2] The prosecution suborned perjury; [3] The police suborned perjury; [4] The police committed perjury; [5] The government's inmate

68

witnesses committed perjury; [6] The jury was biased; [7] The police, the prosecutors, and the government's witnesses defrauded the jury and/or court; [8] The Judge abused his discretion; [9] The prosecutorial misconduct in this case is astronomical; The acts singularly is sufficient to obtain the wrongful conviction of Fields, but cumulatively it's "over kill", and it resulted in a profoundly unreliable, wrong and volatile verdict. The evidence warrants the remedy of reversal for cumulative error; United States v. Bell, 367 F. 3d 452, 471 [5th Cir. 2004], the errors herein so " fatally infected the trial " that they violate fundamental fairness. [ citing Derden v. McNeel, 978 F. 2d 1453, 1457 [5th Cir. 1992] [en banc]. " Claims under the Cumulative error doctrine [may be] sui generis," United States v. Sepulveda, 15 F. 3d 1161, 1196 [1st Cir. 1993], but so was the rare combination of Constitutional violations that marred this trial, each justifies reversal standing alone.

There were so many different contributing factors to Fields wrongful conviction, but the foundation was the conspiracy, first orchestrated by Edward Lee [Treyboy] Outley and Shalaykea [Lakie] Scroggins, then joined by the police and prosecution whom adopted and continued the criminal action(s) to its completion.

The elements of conspiracy are [1] An agreement between two or more persons [2] The object of which is to do an unlawful act or a lawful act by unlawful means. [ A " formal agreement " need not be demonstrated, as an agreement may be demonstrated by circumstantial evidence of a meeting of the minds to commit an unlawful act.]; United States v. Moore, 525 F. 3d 1033 [ 11th Cir. 2008 ]; United States v. Percel, 553 F. 3d 903 [Dec. 23, 2008]. Fields contends that the government and their witnesses joined in a seditious conspiracy to provide false testimony to a grand and petit jury in a capital case so they could manipulate a verdict of guilty, which

would ultimately lead to the murder of Sherman Lamont Fields via lethal injection. The evidence presented in this Freestanding Actual Innocence Petition is undeniable, starting with the deliberate and willful defrauding of the Grand jury when Prosecutor Gloff used U.S. Marshal Chris Casson, and Sheriff Detective Johnny Spillman to lie and say that Fields became [angry] and/or [Irate] when he came into contact with the victim, Suncerey "Shining Star" Coleman, on the night of the murder, while knowing all along that the testimony was and/or would be false. Their actions left the Grand jury, whom had serious doubts about Scroggins testimony, only one option; The option to indict Fields, whom was being held as the sole suspect in Coleman's murder. Whether there was a "formal agreement" or just " a meeting of the minds " to do this illegal and/or criminal act there is no doubt that the conspiracy is complete; Conspiracy only requires that after the "agreement" at least one of the people commits an overt act in furtherance of the agreement. 18 U.S.C. § 371 [1982]; United States v. Beil, 577 F.2d 1313, 1315 n.2 [5th Cir. 1978], cert. denied, 440 U.S. 946, 99 S.Ct. 1422, 59 L. Ed. 2d 634 [1979]; United States v. Sutherland, 463 F. 2d 641, 645 [5th Cir.], cert. denied, * 1569409 U.S. 1078, 93 S.Ct. 698, 34 L. Ed. 2d 668 [1972]. A person suborns perjury when he procures another to commit any perjury. " 18 U.S.C.A. § 1622; See also Dunnigan, 507 U.S. at 94, 113 S.Ct. at 1116 [ applying definition of perjury from 18 U.S.C. § 1621, the criminal perjury statute to § 3C1.1]. When Gloff procured Spillman and Casson to commit perjury and they fulfilled the obligation the conspiracy was complete.

When the evidence wasn't "adding up" the prosecution went "seeking jailhouse testimony", and as a direct result Fields' trial concluded two years later with nothing but "jailhouse testimony", provided by Christian [Chae] Walker, Homero Deleon, Kevin Lamar Burton, John Allen

70

Mercer, Christopher Quigley, Dominique Tubbs, and the two people whom Fields said really committed the murder, Edward Lee [Treyboy] Outley and Shalaykea [Lakie] Scroggins. And it's important to note that in the wake of the government "seeking jailhouse testimony" Outley alleged to have had a letter stating that the government wanted him and/or Scroggins to say that they were " with Fields ", and after Fields repeatedly insisted that he don't even know several of the governments witnesses and had never even seen them until they got up on the stand at trial and lied on him, Chance Alexander, whom also doesn't know Fields, comes forward and admits that someone in law enforcement tried to recruit him to come to trial and lie on Fields too.

It's obvious here that the prosecutions practice of vetting false "jailhouse testimony" turned a routine practice into a monumental conspiracy. Until Outley went to jail on November the 13th, 2001, and Scroggins went to jail on November the 15th, 2001, no one in jail was saying that Fields threatened to kill Coleman, or that he confessed to them in any capacity; Tubbs and Quigley " came forward " after Outley talked to Detective Steve January, and January decided to "reinterview" them; Chris Walker changed his story only after Outley told him to "make a deal" with the prosecution and say that he gave Outley a gun to give to Fields; Then walker further changed his story only after he started corresponding with Scroggins; Jerry Reed "came forward" after he was cell mates with Chris Walker, when Walker was corresponding with Scroggins; Homero Deleon " Came forward " when he was in Fort Worth with Scroggins ex-boyfriend, Eric Snell. Deleon alleged that Fields told him that he would confess to him because Deleon wasn't on the governments witness list to testify. But at the time the government didn't even have a witness list. In addition to that Fields is a "street guy", when all of his

71

friends were murdered when he was just a kid Fields had to fight to live, it doesn't make sense for him to say " Okay, since you're not on the governments witness list let me confess to you so you can get on the governments witness list," because that's essentially what Deleon said. In addition to that Fields don't even know Deleon.

When Deleon got transferred to Three Rivers federal Prison with Chris Walker, Kevin Burton and Casey Forge that's when Deleon's story really evolved; Kevin Lamar Burton "came forward" when he was in Three Rivers Federal Prison with Deleon, Burton, Forge, and Walker after Walker started corresponding with Scroggins; John Allen Mercer "came forward" after Scroggins and Outley went to jail, and coincidentally everything that this racist, terrorist, pedophile said came out of the newspaper. In that essence the circumstantial evidence herein demonstrates a "meeting of the minds" to use perjury to obtain deal[s] from the government, and murder Fields via lethal injection. The PINKERTON DOCTRINE, which finds its roots in Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L. Ed. 1489 provides that " [a] party to a continuing conspiracy may be responsible for a substantive offense committed by a coconspirator pursuant to and in furtherance of the conspiracy, even if that party does not participate in the substantive offense or have any knowledge of it." United States v. Elwood, 993 F. 2d 1146, 1151 [5th Cir. 1993] [quotations omitted] [describing the Pinkerton doctrine]. Even if the parties herein decided to go after the governments "jailhouse testimony seeking deal" on their own they are still a part of the conspiracy as a principle because they each committed an overt act in furtherance of the conspiracy, and once it is established that a person is a member of a conspiracy, any act by a coconspirator in furtherance of the conspiracy is attributable to him; See Pinkerton, Supra. When Deleon testified that

Fields told him the people who went to the Grand Jury on him, and then named five people that didn't even go to the grand jury on Fields, this overt act in furtherance of the conspiracy is attributed to each and every one of them; When Prosecutor Gloff put ATF Agent Douglas Kunze on the witness stand to bolster Deleon's testimony by falsely alleging that they'd given the defense the grand jury transcripts "early on in the investigation", insinuating that the defense had the transcripts in December 2002 when Deleon allege this confession took place, when in fact Fields' attorney's was still asking for the grand jury transcripts in July 2003, and Fields was still asking for the grand jury transcripts in january 2004, this overt act in furtherance of the conspiracy is attributed to every one of them; Every individual act of perjury and/or subornation of perjury is an overt act in furtherance of the conspiracy and it's attributed to each and every one of them; The theory of vicarious liability provides that a person may be found criminally liable even if he did not personally commit a substantive offense. United States v. Broadwell, 870 F. 2d 594, 602-04 [11th Cir.], cert. denied, 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed. 2d 85 [1989]. However, everyone herein did commit a substantive offense; See also United States v. Roper, 874 F. 2d 782, 787-88 [11th Cir.] cert. denied, 493 U.S. 867, 110 S.Ct. 189, 107 L.Ed. 2d 144 and cert. denied, 493 U.S. 955, 110 S.Ct. 369, 107 L.Ed.2d 355 [1989]; When Edward Lee [Treyboy] Outley and Shalaykea [Lakie] Scroggins conspired to put Coleman's murder off on Fields, whether the government knew that Outley and Scroggins were the real culprits of the crime or not, they effectuated the purpose of the conspiracy by "seeking jailhouse testimony" and "recruiting" the coconspirators and formalizing and completing deals with them. In the very least the government aided and abetted the conspiracy under 18 U.S.C. § 2 because they associated with a criminal venture, purposefully participated

73

in the criminal activity by suborning perjury, and sought by their actions to make the venture successful. United States v. Polk, 56 F. 3d 613, 620 [5th Cir. 1995] [citations omitted]. A person associates with the criminal venture if he shares in the criminal intent of the principal; United States v. Jaramillo, 42 F. 3d 920, 923 [5th Cir.], cert. denied, U.S. 115 S.Ct. 2014, 131 L. Ed. 2d 1013 [1995]. It was Outley and Scroggins intention to put Coleman's murder off on Fields and see that Fields was convicted and ultimately murdered via lethal injection; It was the governments intentions to see that Fields was convicted by and through the use of false evidence, and ultimately murdered via lethal injection; It was the other government witnesses intentions to see that Fields was convicted by and through the use of false evidence and ultimately murdered via lethal injection, and the manner in which they all acted was affirmatively designed to aid the venture, therefore when Outley and Scroggins conspired to hide the "Gold" Jaguar alleging that the car was "Blue" so it wouldn't be subjected to forensics testing, that overt act in furtherance of the conspiracy is attributed to each and every one of them; And when the prosecution stood before the jury at trial and willfully and maliciously tried to mislead the jury by claiming that Outley and Scroggins was indeed in a "Blue" Jaguar that hadn't existed for three years prior to the murder, that overt act in furtherance of the conspiracy is attributed to each and every one of them.

The governments intentional, deliberate and willful "seeking of jail-house testimony" that spawned the likes of Jerry Reed, Homero Deleon, Kevin Burton, John Mercer, and Chris Quigley and Dominique Tubbs was and/or is the quintessential "fuel on the fire", if you will. Every since the Courts have started using DNA to right the wrongs of the Justice system it's been unequivocally proven that jurors are unable to guage the level

74

of deception in "jailhouse testimony" cases, and although we recognize that one of the oldest established rules of Anglo American Jurisprudence has been that the jury is the arbiters of credibility of witnesses; Hoffa v. United States, 385 U.S. 293, 311, 87 S.Ct. 405, 418, 17 L.Ed. 2d 374, 387 [1966], DNA testing have proven Hoffa's optimism wrong. In a case that's frighteningly similar to Fields, United Staes v. George Reff Sr., 479 F. 3d 396; 2007 U.S. App. LEXIS 3381, Feb. 15, 2007; No. 06-50076 an acquaintance claimed that Reff "asked him to get rid of a gun for him" and that Reff said that he "Shot the bitch"; A fellow inmate also claimed that Reff gave a somewhat detailed explanation of how he killed the victim, when all the time Reff was innocent.

Another case is Dennis Fritz and Ron Williamson, where the "snitches" gave details so accurate it defied description; The snitch said that Williamson said that he left a "bottle cap" in the victim's anus, and Lo and behold a "bottle cap" was indeed in the victim's anus. It turned out that just like here in Fields the real murderer was one of the State's witnesses.

Again, we recognize that questions of the reliability and consistency of witness testimony are within the province of the jury, however in a case like Fields where the conspiracy is so blatant and multiple documents prove the perjury,there is no denying that Fields was "fatally" harmed. The United States Constitution also guarantees criminal defendants a verdict by an impartial jury. The bias or prejudice of even a single juror is enough to violate that guarantee. Accordingly, the presence of a biased juror cannot be harmless; Dyer v. Calderon, 151 F. 3d. 970, 973 [9th Cir. 1998]; United States v. Martinez-Salazar, 528 U.S. 304, 45 L.Ed. 2d 792, 120 S.Ct. 774, 782 [2000]. First we must address the jurors fascination with law enforcement and their insistence that all "police officers must be obeyed".

75

Under normal circumstances this might be considered harmless, but because so many law enforcement officers committed perjury in Fields case those jurors beliefs harmed Fields tremendously. Issue [1], Detective Morris Colyer lying saying that the Grand Am that Fields was in on the night of the murder had been detailed. [2], ATF Agent Douglas Kunze misleading the jury, lying saying that Edward Lee [Treyboy] Outley and William Young doesn't know each other. [3], U.S. Marshal Chris Casson and Sheriff Detective Johnny Spillman, lying and saying that Fields was angry and/or Irate when he came into contact with the victim. [4], U.S. Marshal Chris Casson lying saying that Fields' mother live a block away from the hospital and he had "other relatives and friend" that lived close by as well so he could have been staking the hospital out. [5]. ATF Agent Douglas Kunze lying and misleading the jury saying that he gave the defense the Grand Jury transcripts early on in the investigation. [6], U.S. Marshal Parnell McNamara, lying saying that Fields told him that he had the .22 pistol and where to find it. [7], Detective Steve January lying saying that the alleged carjacking vehicle was "clean"; This is only a few instances where law enforcement officers committed an overt act in furtherance of the conspiracy to convict and ultimately murder Fields, and their perjury undoubtedly prejudiced the jury towards Fields, especially those jurors that said that "police officers must be obeyed", these blatant and willful acts of deception coerced a guilty verdict and death sentence.

Second of all the law guarantees Fields the presumption of innocence, but this jury took that away from him. Most of them said that "black males" commit most violent crimes. [1], Fields is a black male. And [2], He was charged with a violent crime. A currative instruction, if one were given, can't nor won't change a person[s] lifelong beliefs "on a dime", if

you will, therefore Fields went to trial with this strike against him, his race and the color of his skin fanned the smouldering fires into holocausts, undoubtedly leading to his conviction and death sentence; The bias is evident.

Race played a major role in the outcome of Fields trial, the record reflects that the prosecutors reason for striking five of the six black jurors is pretextual; See Witherspoon v. Illinois, 391 U.S. 510 [1968] which prohibits the exclusion of prospective jurors in a capital case " simply because they voice [ ] general objections to the death penalty or express [ ] conscientious or religious scruples against its infliction " 391 U.S. at 522. The relevant inquiry is " whether the jurors views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath "; Wainwright v. Witt, 469 U.S. 41, 424 [1985] [ citation and quotation omitted ]. See also Turner v. Marshall, 121 F. 3d 1248 [9th Cir. 1997]. At least one of the black jurors said that she could return a verdict which resulted in a death verdict and follow the law in sentencing. [ See Voir Dire of Patsy Caufield, pgs. 561-569; App. A-229]. Racial discrimination in jury selection offends the Equal Protection Clause, Georgia v. McCollum, 505 U.S. 42, 44. The prosecution used peremptory strikes to exclude 90% of the eligible black venire panelists, a disparity unlikely to have been produced by happenstance. It is well known that prejudices often exist against particular classes in the community, which sway the judgement of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full enjoyment of that protection which others enjoy; Strauder v. West Virginia, 100 U.S. 303, 309 [1880]; See also, Batson v. Kentucky, 476 U.S. 79. Defendants are harmed, of course, when racial discrimination in jury selection compromises the right of trial by

77

impartial jury; Strauder v. West Virginia, Supra, at 308, but racial minorities are harmed more generally, for prosecutors drawing racial lines in picking juries establish " State-sponsored group stereotypes rooted in, and reflective of, historical prejudice," J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 128 [1994]. Just because the prosecution kept a  black juror with ties to law enforcement so they could skate past Batson v. Kentucky it doesn't cure the prejudice.

Third: Judge Smith's erroneous denial of Fields' proper peremptory challenge required automatic reversal; United States v. Annigoni, 96 F. 3d 1132 [9th Cir. 1996].

Potential juror Kenneth Kennedy said in his juror questionnaire that " If you kill, you will be killed." Fields didn't kill anyone, but he still was guaranteed a fair and impartial jury. During Voir Dire Mr. Kennedy said that he meant " An eye for an eye " after it has been proven in Court." Judge Smith acknowledged that that wasn't the law, but refused to strike for cause, saying that he " don't believe " that's what Mr. Kennedy said. [ See Voir Dire of Kenneth Kennedy, pgs. 331-333; App. A-230]. Judge Smith abused his discretion for failing to strike Mr. Kennedy for cause. See United States v. Fernando Jimenez, No. 05-4098, Ana Martell, No. 05-4099, Kathy Giunta, No. 05-4106, Luis Nieves, No. 05-4107, and Rene Abreu, No. 05-4157, 513 F. 3d 62; 2008 U.S. App. LEXIS 715; 75 Fed. R. Evid. Serv. [Callaghan] 556 [Jan. 14, 2008]. In Jimenez, Martell, Giunta, Nieves, and Abreu, just like here in Fields the defendants were given four extra peremptory strikes. Judge Smith first gave Fields three extra strikes and gave the government one extra strike, but changed his mind and just gave Fields four extra strikes. The Jimenez, Martell, Giunta, Nieves and Abreu court held that the defendants couldn't prove that despite being given the extra strikes, a bias jury was seated to judge

them. [ See also, United States v. Lopez, 271 F. 3d 472, 489, 44 V.I. 311 [3d Cir. 2001], cert. denied, 535 U.S. 908, 122 S.Ct. 1211, 152 L. Ed. 2d 148 [2002]. Here in Fields the deck was stacked against Fields from the very beginning, and even the extra strikes couldn't have cured the bias against him. The jury that was ultimately seated to judge Fields was unquestionably biased, with racist tendencies and/or ideals. And although striking Mr. Kennedy for cause still wouldn't have "calmed the storm", if you will, striking Mr. Kennedy was the lawful thing to do; The only requirement to disqualify Mr. Kennedy was a showing of either actual or implied bias-" that is bias in fact or bias conclusively presumed as a matter of law." 47 AM. Jur. 2d jury § 266 (1995). Judge Smith admitted that Mr. Kennedy's " eye for an eye " ideology is not the law therefore Kennedy was supposed to be struck. In addition to that Ms. Cauffield should have been restored to the jury by and through the Batson Challenge. And again. although the bias and prejudice was too overwhelming to overcome it was the right thing to do.

And Fourth, Fields contends that Judge Smith's comment to Juror Donna Williams coerced his conviction. The Judge should not say or do anything that will give the jury the impression that he's improperly vouching for the prosecution; United States v. Harlow, 444 F. 3d 1255 [10th Cir. 2006]. During Voir Dire Judge Smith told Juror Donna Williams that if the prosecutors thought that someone's rights are not being protected they will go so far as to dismiss the case rather than pursue it. [ See Voir Dire of Donna Williams, pg. 397; App. A-231]. Therefore Judge Smith improperly vouched for the prosecution, especially in light of the fact that the prosecution did exactly the opposite; (i.e) went "seeking jailhouse testimony"; Suborned perjury; fabricated evidence; aligned themselves with a criminal ventur, etcetera; It's more than

79

likely that Judge Smith's comment to Ms. Williams coerced Fields' conviction; United States v. Yarborough, 400 F. 3d 17 [D.C. 2005].

Another contributing factor to Fields' wrongful conviction was Judge Smith's repeated abuse of discretion. It started when Judge Smith, knowing that he was bias, didn't recuse and/or disqualify himself from overseeing the case. Unbeknown to Mr. Fields at the time Judge Smith had a long-standing relationship/friendship with the attorney for the victim's family, William [Bill] Johnston, and that relationship was called into question before in another case. Fields contends that Smith's relationship with Johnston was a contributing factor in most, if not all of the erroneous decisions that Smith made, and it harmed Fields greatly.

About a year prior to Fields, in Andrade v. Chojnacki, 338 F. 3d 448 [July 14, 2003] Attorney William [Bill] Johnston was one of the original defendants in a lawsuit stemming from the botched raid at the Branch Davidian Compound in Waco, Texas. While the case was before Judge Smith a special counsel from within the Justice department investigated Johnston for allegedly withholding evidence from the then defendant Branch Davidians during their criminal trial. According to newspaper report, (338 F. 3d 458) Judge Smith was upset by the investigators treatment of Johnston ( the article used the term "witch hunt" to describe Judge Smith's view). In response Smith told several investigators that he would no longer cooperate with the inquiry. Also in the case Smith declared that he had not read the evidence prior to denying its admissibility, which in fact alignes with what Smith did in Fields case when he denied Fields the right to impeach Scroggins alibi by ruling that it wasn't relevant. ( See Cross. exam. of Scroggins, by Fields, pg. 1621; App. A-24]. A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the

determination, or make findings of fact that are clearly erroneous. Chicago Tribune Co. v. Bridgestone/Firestone Inc., 263 F. 3d 1304, 1309 [11th Cir. 2001]. When Fields asked Judge Smith isn't all relevant facts proving who committed the murder admissible Judge Smith said, "No". [ See Cross exam. of Scroggins, by Fields, pg. 1652; App. A-232]. And then Smith threatened to cut Fields' cross examination short. A moment later Smith did cut Fields cross examination short and allowed the government to take over and elicit some false and very damaging testimony from Scroggins. [ See exam. of Scroggins, pgs. 1665-1668; App. A-233]. Judge Smith violated confrontation and due process clauses by curtailing Fields cross examination of Scroggins when he restricted Fields from attacking her alibi; Kittelson v. Dretke, 426 F. 3d 306 [5th Cir. 2005; United States v. Adamson, 291 F. 3d 886 [9th Cir. 2002]; United States v. Beckman, 222 F. 3d 512 [8th Cir. 2000]; United States v. Berkowitz, 622 F. 2d 1127 [5th Cir. 1981] (unit B). Judge Smith abused his discretion. United States v. Russell, 703 F. 2d 1243, 1249 [11th Cir. 1983]; Walker v. Dretke, U.S. Dist. LEXIS 37158 [2006]. Judge Smith's actions prejudiced and/or harmed Fields greatly, Smith gave the jury the impression, when he stopped Fields' cross examination and allowed the prosecution to take over and elicit the damaging testimony, that the prosecution was more credible than Fields.

Another instance that undoubtedly prejudiced Fields is when prosecutor Gloff tried to elicit false testimony from Officer Ben Burch. Fields objected and in open Court Smith asked Gloff what was the relevance and Gloff said that Fields admitted to the murder. [ See Direct exam. of Ben Burch, by Gloff, pgs. 1560-1561; App. A-234]. And although Judge Smith ruled that it was not a confession he gave no currative instruction, so the last thing that the jury heard was that Fields had admitted to the

81

crime.

All of this in addition to Judge Smith forcing Fields to proceed Pro se. Fields contends that Judge Smith's relationship with Attorney William [Bill] Johnston caused him to make these erroneous decisions because he wanted to satisfy his friend. William [Bill] Johnston sued Civigenics for the victim family therefore Judge Smith contributed in the only way that he knew how, by saying and doing things that harmed Fields and contributed to the wrongful conviction.

The evidence herein warrants the remedy of reversal for cumulative error. United States v. Bell, 367 F. 3d 452, 471 [5th Cir. 2004]. The errors herein so fatally infected the trial it violated fundamental fairness. ( citing Derden v. McNeel, 978 F. 2d 1453, 1457 [5th Cir. 1992]. (en banc) " Claims under the Cumulative Error Doctrine [may be] sui generis", United States v. Sepulveda, 15 F. 3d 1161, 1196 [1st Cir. 1993]. But so was the rare combination of Constitutional violations that marred this trial, each justifies reversal standing alone.

Also Judge Smith's reasoning for not appointing Fields new attorney's was again calculated to give the advantage to the prosecution and Smith's friend, William [Bill] Johnston. Smith claimed that " It is simply not possible for an attorney to step into this courtroom and represent you in this type of case or any type of serious case without having adequate time to prepare themselves and to understand the evidence--" Smith said that he wouldn't order anyone to accept such an assignment; " That would be a travesty of justice." [ See TT, pg. 66; App. A-13]. But that's exactly what Judge Smith did to Fields whom was asking for the discovery file all the way up through jury selection. Smith ordered and forced Fields to accept " such an assignment." Then in the order denying Fields' Habeas Petition Smith said that Fields never " sought a continuance "

82

with the court. [ See pg. 73 of 137, Judge Smith's opinion; App. A-235]. However, at trial Smith had made it absolutely clear that he wouldn't delay the trial. [ See TT, pg. 65; App. A-13].

Another thing that Judge Smith did to prejudice Fields is that Smith admonished Fields in front of the jury repeatedly. [ See one instance; Cross exam. of Scroggins, by Fields, pg. 1652; App. A-232]. And the one time Smith admonished the prosecutor it was in a bench conference. [ See Recross exam. of Edward Outley, pgs. 1855-1856; App. A-75]. The Fifth Circuit equates the phrase [abuse of discretion] with " arbitrary and capricious "- clearly improper. Abu-Awad v. United States, 294 F. Supp. 2d 879; Judge Smith's decisions were arbitrary because they were made without a rational connection between the known facts and the decision or between the found facts and the evidence. There is no clear evidence in the record, even disputable to support Judge Smith's denial of benefits.

When Judge Smith told Juror Donna Williams that the prosecutors would dismiss the case if they thought Fields' rights were being violated, his comment was the equivalent of testimony for the government; When Judge Smith told Fields that he better find some admissible questions or he would cut Fields' cross examination short, Smith's comments was the equivalent of testimony for the government; United States v. Nickl, 427 F. 3d 1286 [10th Cir. 2005]; Therefore every [witness] the government called to the stand the Judge's comment to Juror Donna Williams put the prestige of the United States government behind them.

And Judge Smith also violated Fields six Amendment Confrontation Clause right under Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L. Ed. 2d 674 [1986]. by limiting his cross examination of Scroggins. The Confrontation Clause guarantees a criminal defendant the

83

right to confront witnesses on cross examination, and while we recognize that " a district court retains wide latitude insofar as the confrontation clause is concerned to impose reasonable limits on such cross examination based on concerns about...harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." United States v. Tykarsky, 446 F. 3d 458, 475 [3d Cir. 2006] [quoting United States v. Mussare, 405 F. 3d 161, 169 [3d Cir. 2005], cert. denied, 126 S.Ct. 1432, 126 S.Ct. 1432, 164 L. Ed. 2d 152 [2006], [ some internal marks omitted ]. Fields had none of those concerns, his cross examination of Scroggins was limited because of prosecutorial misconduct, fraud on the Court, the Judge's abuse of discretion, and a criminal conspiracy to murder Fields via lethal injection.

After reading through Fields' Freestanding Actual Innocence Petition no Judge or Jury of reason can find that Fields wasn't "fatally" harmed by the barrage of errors that infected Fields' trial, there were, and are so many fatal errors reversal is warranted.

In the United States v. Mejia, 597 F. 3d 1329 [Feb. 19, 2010] the Court held that a prosecutor errs in closing argument by making a statement unsupported by evidence, misstating evidence, or misquoting testimony; During trial Fields attempted to show the jury that he didn't even know inmate Kevin Burton. [ See Cross exam. of Burton, by Fields, pgs. 1387-1390; App. A-152] Burton alleged that he'd last seen Fields in 1993 then later said that he meant to say 2003. In closing prosecutor Snyder argued that Fields was a liar and misquoted the testimony. [ See Closing argument, pgs. 2030-2032; App. A- 236]. Since Fields' case came down to credibility, Snyder misquoting the testimony and blatantly misleading the jury harmed Fields substantially. United States v. Watson, 171 F. 3d 695, 699, 335 U.S. App. D.C. 232 [D.C. Cir. 1999]; Bledsoe v.

Bruce, 569 F. 3d 1223 [June 26, 2009]; United States v. Azubike, 504 F. 3d 30 [1st Cir. 2007]. It was inmate Homero DeLeon whom claimed that he saw Fields at a store in May or June of 2000, and when Fields informed Deleon that he was in State prison at that time, Deleon said, " That must not have been you then." [ See Cross exam. of Deleon, by Fields, pgs. 1430-1433; App. A-137].

The governments case in chief was misleading, fraudulent, and criminal; They misled the jury to believe that Fields escaped to kill Coleman when in fact they knew all along that Fields had actually started trying to escape when he first got locked up because he'd just gotten out of prison and didn't want to go back. [ See exam. of Timothy Robinson, by Fields, pgs. 1943-1945; App. A-237] And [ Cross exam. of Outley, by Fields, pgs. 1844-1845; App. A-238]. The government knew that the escape itself had nothing whatsoever to do with Coleman having a child by someone else. Unfortunately for Fields, Coleman's friends and family had been manipulated by law enforcement to believe that Fields murdered Coleman, and after admitting that Scroggins did indeed have a motive to murder Coleman, refused to talk to Fields' defense team. ( See TT, pgs. 3-5; App. A-239 ). Because the media was dispensing so much one-sided information; [ See Deposition, pg. 143, and Deposition pgs. 147-148; App. A-240] and Scroggins and Outley, with excruciating detail, was also telling everyone that Fields killed Coleman, recruiting inmates, and "lying themselves out of a pickle", as the prosecution so eloquently put it at Outley's felon in possession trial, no one can be certain where all the conflicting testimony came from, but it's certain that it didn't come from Fields. Inmate Deleon and Inmate Reed both alleged that they were in the cell " across the hall " from Fields in December 2002 and January 2003 respectively, and Fields yelled across the hallway and confessed to

them. Officer Frederick Waggoner said that Fields didn't talk to anyone, but " an old spanish guy " [ Francisco [Pancho] Rios ], and corrections officers, but never any confessions. And if Fields would have confessed to Reed or Deleon across the hall the forever present officer's, and the 60 to 80 other inmates would have heard it. [ See Report of Investigation; App. A-241]. The same rings true in the case of inmate John Mercer. Although it was a different facility, the make-up is the same, there is no way that Fields confessed to Mercer from one cell to another like Mercer first alleged, or to "other people" down the hall like Mercer switched his testimony to at trial, without the officer's and other inmates hearing it, and the government knew this. In Roberts v. South Carolina, 361 S.C.1 ; 602 S.E. 2d 768; 2004 S.C. LEXIS 218, the Court held that it was impossible for someone to confess in the manner in which Deleon, Reed, and Mercer claim that Fields confessed to them.

And we must also take into account the other raw facts, the prosecution went "seeking jailhouse testimony", this was a disaster waiting to happen from the very beginning. [ See The Rat Trap; App. A-242]. But when you consider other astonishing facts it's obvious that Scroggins committed this murder; She alleged that she knew that Coleman was missing on November 7, 2001 (which was the day after the murder) " because it was on the newsstand." [See Scroggins Grand Jury testimony, pg. 36; App. A-61]. But it didn't hit the newsstand until November 9, 2001, and the only way Scroggins could have known that Coleman was missing on the day after the murder was if she killed her. If you look at the coroners report [ See Coroners report, pg. 2; App. A-243], where it say that the path of the wound is possibly " right to left, back to front and upward," If Coleman was shot from the back while standing the shooter would have

to be shorter; Coleman was 5'8, Scroggins is 5'1. [ See Scroggins height, App. A-244]. Fields is 5'9, essentially the same height as Coleman. And Scroggins implicates herself, taunting Fields, in a Mary J. Blige song, stating, " The alleged Assailant is 5 foot 1." [See letter [song lyrics]; App. A-245]. In addition to that Scroggins also told the police where to find the body. Scroggins alleged that Fields told her that Coleman's body was near Tanesha Hilliard's mother's house, and the body was indeed found there. But, Fields have never even been to Tanesha Hilliard's mother's house and had no ideal where she live. Fields had only just met Hilliard through the victim, Suncerey Coleman, but Scroggins have known Hilliard and the rest of her family for years. Scroggins brother, Barry Scroggins has a child with Tanesha Hilliard, and often the Scroggins family would either visit the child at Hilliard's mother house, or go there to pick the child up, so if Scroggins murdered Coleman near Hilliard's mother house then it's obvious that she would know where she left the body. [ See Cross exam. of Hilliard, by Fields, pg. 1348-1349; App. A-246]. This was a rural area, in order for one to know where Hilliard's mother live you would have had to have been there before; Scroggins even described the crime scene, " that there were mattresses there." Scroggins even described Coleman's body, all the way down to what color bra Coleman was wearing. Taking all of this into consideration with the fact that Scroggins had access to the murder weapon, Scroggins had a motive to kill Coleman, She gave conflicting alibi's for the time of the murder, she and Outley conspired to hide the car that they were in on the night of the murder, and given Scroggins mental and emotional state when it came to Fields and Coleman being together, the letter where she say that she'd lost Fields to Coleman once and she would not let it happen again, and if it did happen, she would be "Killing bitches!"

87

All of this is compounded by the multiple lies that she and Outley told, along with the evidence that they were intentionally recruiting inmates to lie on Fields, there is no doubt that Scroggins killed Coleman. And if law enforcement would have did their job and focused on everyone with a motive to kill Coleman instead of just assuming that Fields did it then any reasonable jury could have, and/or would have found Scroggins guilty of Coleman's murder based on these facts alone; Whereas if you eliminate all of the false testimony from Fields' case there is nothing connecting him to Coleman's murder.

The facts herein dictate that this isn't your average wrongful conviction where the prosecution "made a mistake", this is an intentional, willful, premeditated Murder for Hire Scheme orchestrated by both Outley and Scroggins and law enforcement and prosecutors. Outley and Scroggins set this conspiracy in motion when they murdered Coleman and "agreed" that they would put the murder off on Fields, and the government joined the conspiracy when they went "seeking jailhouse testimony", fabricated evidence, and then made deals with crooks that are obviously lying, and sealed those deals with the false testimony at trial and the composition and execution of the 5K1.1 plans.

The government can't claim that they didn't know that their witnesses were lying because 99.9 percent of the documents in the appendix that proves their witnesses are lying came from the government's discovery file. Here we have Walker lying saying that he don't talk to Outley about the case when in fact Walker admitted to the Grand Jury that he and Outley discuss the case, and there's a letter from Outley to Walker telling Walker to lie and say that he gave him a gun "for Fields", but make a deal with the government first.

Then there's Scroggins claiming that she never discussed the murder

88

with anyone but prosecutors/law enforcement, when in fact several people admit that Scroggins "discussed" the murder with them; and there's a letter from Scroggins admitting that she's writing Walker "discussing" the case, right before Walker changed his story.

But most importantly the government knew that Outley and Scroggins conspired to hide that "Gold" Jaguar, and instead of admitting it the government went to trial and tried to convince the jury that Scroggins and Outley were indeed in a "Blue" Jaguar that they knew didn't even exist.

There's another issue that the prosecution misrepresented and the Courts misconstrued. Everyone knows that Outley was all over the place; He said that he gave Fields a gun; He said that he didn't give Fields a gun; He said that Walker gave him a gun to give to Fields; He said that Walker didn't give him a gun; Walker said that he gave Outley the gun for protection; Outley said that he gave the gun to Alberta "Na-Na" Hampton; Hampton said that she never saw the gun.

At trial Fields could only attack Outley's multiple inconsistent lie[s] ane lie at a time. Fields started with the initial phone call from the jail, he asked Outley did he say that Fields asked for a gun " during that phone call." [ See Cross exam. of Outley, by Fields, pg. 1831-1832; App. A-247]. Outley admitted that he hadn't said that Fields asked for a gun on page 7 of his grand jury testimony, " during that phone call."

On redirect prosecutor Snyder manipulated the jury once again, stating: " You were asked on cross examination, you never told the grand jury about the gun and you agreed. In fact, you spent a page and a half of the grand jury telling them about the gun that you gave to Sherman Fields; isn't that correct?" [ See redirect exam. of Outley, by Snyder, pg. 1853; App. A-74].

89

Fields came back on recross examination and made it absolutely clear that he was talking about that specific time, " on page 7 of Outley's grand jury testimony, " during that phone call." [ See recross exam. of Outley, by Fields, pg. 1854; App. A-248].

On direct appeal the 5th Circuit highlighted this incident and said that " it appears that Fields deliberately tried to mislead the jury." [ See 5th Circuit opinion; pg. 37; App. A-249]. But Fields wasn't trying to mislead the jury, it was the government that misled the jury. The evidence supports Fields' cross and recross examination of Outley. [ See Outley's grand jury testimony, pg. 7; App. A-250]. Just as Fields said, Outley had given so many different versions of the story, therefore Fields could only impeach his testimony where it was impeachable. On page 7 of the grand jury testimony where Outley talks about when Fields called him from the jail Outley had said that Fields asked him did he have a car to come pick him up, it doesn't say nothing about Fields asking him for a gun; Again, it was the government that deliberately misled the jury, and apparently the court of appeals also.

The evidence put forth in this ' Freestanding Actual Innocence ' petition can't be denied, the government's misconduct was criminal and very blatant. United States v. Scheetz, 293 F. 3d 175, 185 [4th Cir. 2002]. In Fields case the prosecutor's misconduct so infected the trial with unfairness it makes the conviction a denial of due process. Fields have shown that perjured testimony was indeed used against him; United States v. Griley, 814 F. 2d 967, 970-71 [4th Cir. 1987]. And the government knowingly used that perjured testimony to secure Fields' conviction.

Now, although Fields is using various case law to outline his innocence, and define the law in regards to the multiple violations, if the government attept to argue that certain claims are defaulted, Fields is

90

actually and/or factually innocent of the crime(s) that he has been wrongly convicted of and therefore any procedural defaults are excused as a matter of course under the fundamental miscarriage of justice exception; See Mize v. Hall, 532 F. 3d 1184, 1195 n.9 [11th Cir. 2008], and any cause for the default is attributed to the actions of the government, Prosecutors can't lie and "trick" a grand jury into returning an indictment, hire crooks to lie and defraud the Court, force an innocent man to represent himself when he clearly tells the Court that he don't know what he's doing, convict him and send him to death row, and then say " he defaulted his issues "; See Coleman v. Thompson, 501 U.S. at 750, 111 S.Ct. 2546 [115 L. Ed. 2d 640 [1991], and Schlup v. Delo, 513 U.S. 298, 314-16, 130 L. Ed. 2d 808, 115 S.Ct. 851 [1995]. Fields have established a "colorable showing of innocence"; See Kuhlmann v. Wilson, 477 U.S. at 454 & n.17, 106 S.Ct. at 2627 & n.17. In light of all the evidence herein the trier of facts/ a fair and impartial jury would have undoubtedly reached a different verdict, for Fields have demonstrated a substantial showing of the denial of his constitutional right[s]. Hill v. Johnson, 210 F. 3d 481, 484 [5th Cir. 2000]. No one can deny that the issues herein are debatable amongst jurists of reason, but there's an even greater dilemma here; The government chose to enter into a criminal conspiracy with the likes of convicted rapers, robbers, terrorist, child rapist, thieves, drug dealers, attempted murderers, and the real murderers of Suncerey Coleman just so they can convict and murder Sherman Lamont Fields, who's innocent of Murder, carjacking, possessing the .22 pistol; How do one justify making a deal with the guilty in order to convict and murder a man that not only the law guarantees the presumption of innocence, but whom is actually innocent?

The most egregious misconduct, next to the conspiracy to murder Fields

was that in which was directed at the Court itself. [ Fabrication of evidence by counsel [prosecutors]; See Pfizer inc. v. Int'l Rectifier Corp., 538 F. 2d 180, 195 [8th Cir. 1976], cert. denied, 429 U.S. 1040, 97 S.Ct. 738, 50 L. Ed. 2d 751 [1977]. The government defrauded the Court, they perpetrated a species of fraud that subverted the integrity of the Court itself so that the judicial machinery could not perform in the usual manner and the impartial functions of the Court have been directly corrupted; The prosecutors violated their duty of honesty to the Court. See Sawyers v. Collins, 986 F. 2d 1493, 1497 [5th Cir. 1993]; citing Barefoot v. Estelle, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L. Ed. 2d 1090 [1983]. It's clear here that the government and their witnesses committed a host of criminal and procedural violations and Fields contends that had the government not defrauded the jury and/or Court the evidence would have lacked sufficiency to even carry the case to the jury, let alone acquire a conviction. United States v. Carter, 270 F. 3d 731, 734 [8th Cir. 2001]; United States v. Gary Flute, 363 F. 3d 676; [2004]. Even considering the evidence in the light most favorable to the verdict[s] any reasonable jury would find that the governments case is in dispute. United States v. Salazar, 958 F. 2d 1285, 1290-91 [5th Cir.] cert. denied, 506 U.S. 863, 113 S.Ct. 185, 121 L. Ed. 2d 129 [1992]. And the evidence herein proves every element of Fields' claim, especially and in addition to his Actual Innocence. If we just look at Kevin Lamar Burton's testimony it's factually impossible and rendered incredible as a matter of law; There is no way that Fields confessed to him on November 16, 2001 while Fields was in a 4-door Grand Am, and Outley was in "a jaguar", when in fact the Grand Am or the Jaguar was no longer in the picture after the night of the murder, two weeks prior to when Burton claim the confession took place; the Grand Am

92

was a 2-door, not a 4-door; the Grand Am went to the forensics lab on the 14th of November, and Outley went to jail on the 13th; United States v. Jarvas, 86 F. 3d 383, 388 [5th Cir. 1996].

To establish the bare minimum of perjury Fields relies on Phair v. United States, 3 Cir., 1932, 60 F. 2d 953, 954: " A living witness is no longer necessary to prove perjury where documents show that the oath was false;"In Hammer v. United States, 1926, 271 U.S. 620, 627, 46 S.Ct. 603, 604, 70 L. Ed. 118, it was said: " Undoubtedly in some cases documents emanating from the accused and the attending circumstances may constitute better evidence of such falsity [of the matter alleged as perjury] than any amount of oral testimony." See also United States v. Nessanbaum, 3 Cir., 1953, 205 F. 2d 93 and United States v. Palese, 3 Cir., 1943, 133 F. 2d 600, 602. Here in Fields, the Appendix is "chalk full" of documents proving that the government and their witnesses committed perjury in order to obtain Fields' conviction and ultimately Fields' murder. In Davis, No, CV 409-130 [8/24/10] the Courts held that the lowest degree of confidence in a jury verdict would presumably occur when the jury hears a Corrupted Body of evidence. Because the procedural protections in place to protect the innocent from conviction have been breached, confidence in the result of the trial is generally undermined. The [ Supreme Court ] has repeatedly held that a conviction obtained by and through the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the testimony could have affected the judgement of the jury; United States v. Agurs, 472, U.S. 97, 103, 49 L. Ed. 2d 342, 96 S.Ct. 2392 [1976]. In Fields' case the government's entire case was perjured testimony. The lies that the government witnesses told are so obvious that no person of ordinary prudence would have put them on the stand. It's patently obvious

93

that the government knew that every one of their witnesses would and/or did commit perjury, yet they connived at or knowingly acquiesced in the use of this perjured evidence.

In Smith v. Kemp, 715 F. 2d 1459, 1463 [11th Cir.], cert. denied 464 U.S. 1003, 104 S.Ct. 510, 78 L. Ed. 2d 699 [1983], the Court held that " If false testimony surfaces during a trial and the government has knowledge of it, the government has a duty to step in and disclose " ; [ The government must affirmatively correct testimony of witness who fraudulently testifies that he has not received a promise of leniency in exchange for his testimony.]

During trial Fields asked Edward Lee [Treyboy] Outley had the government made him any promises and Outley fraudulently testified that they hadn't and the government did nothing to correct the false testimony. In Tassin v. Cain, 517 F. 3d 770 [5th Cir; Feb. 14, 2008], the Courts held that it was contrary to federal law and vacated the sentence because the prosecution's refusal to acknowledge a deal of leniency misled the jury in violation of the Fourteenth Amendment.

The government also has a duty not to use false testimony; Giglio v. United States, 405, 150, 92 S.Ct. 763, 766, 31 L. Ed. 2d 104 [1972]; Williams v. Griswald, 743 F. 2d 1533, 1541 [11th Cir. 1984]. In Fields' case the government did use false testimony. The culmination of the many lies denied Fields due process of law as recognized by the Fifth Amendment. In Napue v. Illinois, 360 U.S. 264, 259, 3L. Ed. 2d 1217, 79 S. Ct. 1173 [1959], Chief Justice Warren wrote for the Court, " First, it is established that a conviction obtained through the use of false evidence, known to be such by representatives of the state, must fail under the Fourteenth Amendment; The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected."

94

In Fields case there is no doubt that his conviction was obtained through the use of false evidence, undoubtedly known to be such by the prosecution because their own evidence proves that their witnesses were lying; The Conspiracy to hide the Jaguar is only one such incident.

In Napue v. Illinois, Supra; the Court held that when public officers connive at or knowingly acquiesce in the use of perjured evidence their misconduct denies a defendant due process of law; Mooney v. Holohan, 294 U.S. 103, 79 L. Ed. 791, 55 S. Ct. 340 [1935]; The multiple acts of perjury, subornation of perjury and other violations herein by public officers makes Napue valid.

The government also has a duty not to exploit false testimony by prosecutorial argument affirmatively urging the jury the truth of what it knows to be false; United States v. Sanfilippo, 564, F. 2d 176, 179 [5th Cir. 1977] [ Defendant's conviction reversed because, " The government not only permitted false evidence of one of its witnesses to go to the jury, but argued it as a relevant matter for the jury to consider."] In Fields' case, inmate Homero DeLeon, an inmate whom Fields had never met, or even seen before until he got up on the witness stand testified that in December 2002 Fields confessed to him. In order to try to give his lie credibility Deleon alleged that Fields told him the names of five people that went to the Grand Jury against Fields. However, the five people that he named didn't go to the grand jury on Fields, and each of the five Deleon knew personally.

The government called ATF Agent Douglas Kunze to the witness stand to "corroborate" Deleon's story, while knowing that Kunze would commit perjury. Kunze testified that they'd given the grand jury transcripts to Fields' defense team " early on in the investigation," indicating that Fields had the grand jury transcripts at the time that Deleon allege

95

that Fields made this alleged confession to him. But a letter from Fields' defense counsel disputes this; The letter is to both prosecutors, Gloff and Snyder asking them to turn over the grand jury transcripts " a reasonable time before trial."

The government knew that Deleon was lying, yet they put him on the stand to commit perjury anyway, and compounded Deleon's perjury with ATF Agent Kunze's perjury; Then the government argued to the jury that Fields had to tell Deleon the things that Deleon allege since Kunze said that he'd given Fields' attorney's the grand jury transcripts "early on in the investigation", yet they knew the contrary to be true.

The government was in violation of Napue v. Illinois, Supra, and Giglio v. United States, Supra, by using and allowing the use of perjury. It has also been held that knowingly false or misleading testimony by a law enforcement officer is imputed to the prosecution; Wedra v. Thomas, 671 F. 2d 713, 717 n.1 [2d 1982]; Curran v. Delaware, 259 F. 2d 707, 712-713 [3d Cir. 1958] [citing Pyle v. Kansas, 317 U.S. 213, 87 L. Ed 214, 63 S. Ct. 177 [1942]; The knowing use of perjured testimony constitutes a due process violation as defined in Kyles v. Whitley, Supra. In the United States v. Roger Lapage, 231 F. 3d 488 [2000] the courts held that " All perjury pollutes a trial, making it hard for jurors to see the truth. No lawyer, prosecutor, or defense counsel, civil or criminal, may knowingly present lies to a jury and then sit idly by while opposing counsel struggle to contain this pollution of the trial. The jury understands defense counsel's duty of advocacy and frequently listens to defense counsel with skepticism. A prosecutor has a special duty commensurate with a prosecutor's unique power, to assure that defendants receive fair trials. " It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every

Case 2:16-cv-00418-JPH-MJD    Document 1-5    Filed 10/26/16    Page 103 of 111 PageID #: 185

legitimate method to bring about one." The government here in Fields polluted the trial with numerous acts of perjury, calculated to bring about Fields' conviction and death sentence. And while the Courts recognize that jurors view defense attorney's with skepticism, then one can only imagine how they viewed Fields, standing alone, trying to conquer the pollution of perjury, while the prosecutors sat idly by watching this innocent man flounder.

The government violated Section 201 (c) (2) of Title 18 of the United States Code that prohibits giving, offering, or promising anything of value to a witness because of his/her testimony. Every one of the government witnesses were promised either a time reduction or leniency on their own charges. Inmate John Mercer claim that he didn't get a deal and the government backed him, but in quoting United States v. Onori, 535 F. 2d 938, 945 [5th Cir. 1976] the Courts held that it " is so important that the defendant is allowed to search for a deal between the government and the witness, even if there is no hard evidence that such a deal exists. What tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists."

John Mercer was the racist, pedophile, terrorist whose testimony mirrored newspaper reports. He'd been to prison four times and was on parole with a Life sentence and received only twenty five years for sexual assault on a child; By all intents and purposes Mercer was supposed to receive another Life sentence. And on top of that either he was never charged or the charges were dropped against Mercer for threatening to kill the Judge and his family and blow up every federal building in Waco, Texas. Everyone knows that it's customary for prosecutors to forego the paperwork in cases like this, where Mercer was already being prosecuted in the state for the child sexual assault; All the

97

federal prosecutor had to do, as it appears that he did here, is call the state prosecutor and tell them that Mercer was "assisting" them in Fields case and to go lenient on Mercer, that's the only justification for a twenty five year sentence in such a heinous case.

In the United States v. Sonya Evette Singleton, 144 F. 3d 1343 [1998], Singleton argued that the government violated Section 201 (c) (2) of Title 18, by promising leniency to a witness in return for his testimony against her. The 10th Circuit reversed the conviction and remanded for new trial. But on rehearing en banc, United States v. Sonya Evette Singleton, 165 F. 3d 1297 [1999], Circuit Judge Porfilion held that within the statute penalizing whoever gives, offers or promises anything of value for or because of his testimony, the word "whoever" does not include the United States acting as alter ego of the United States and offering an accomplice leniency in exchange for truthful testimony.

In Fields' case the key word isn't "whoever" like Singleton argued, but the operative word in Fields is "Truthful". There is no doubt that perjury was the dominant factor in Fields' case. The governments promises and/or suggestions of leniency and time reductions in exchange for testimony that's undoubtedly false turned their witnesses into "paid 'occurence' witnesses", thus employed by a fraudulent and deceptive sovereign, and testimony from those of such ilk is contrary to the fundamental precepts of American Justice. The "Blueprint" on how to commit murder thrives in Waco, Texas. In cases like Fields, where there is no evidence to sustain a conviction, the prosecution can just go out and make a deal with a bunch of criminals to lie; This within itself brings about a different set of problems; [one] It essentially decimates the burden of proof, the lies, deception and fraudulent and criminal misconduct obtains the conviction and shifts the burden of proof onto

98

the defendant, which creates an almost impossible hurdle to overcome, because Appeals Courts don't look at evidence the same way that a jury does; A jury, unable to guage the level of deception, will use a lie to convict. On the other hand, the Court of Appeals will recognize the lie, but let it stand, stating that it's "harmless error". So that lie will ultimately send an innocent man to his death. And [two] It undermines the presumption of innocence when you take the testimony of a guilty man, let alone the false testimony of a guilty man, and use it to convict [ and in Fields' case ] murder, not only a man that was supposed to be presumed innocent, but whom is Actually innocent.

If we look at the 5th Circuits opinion in Fields' case on Direct Appeal it's a testament to the fact that the Courts often are misled by the prosecution. The nature of Coleman's murder, the witness' testimony, the crime scene make-up all dictate that there should have been DNA to test; The victim and the perpetrators DNA [blood] should have been found in the Grand Am that Fields drove on the night of the murder, as well as the motel room, and it wasn't, there was no DNA. But if investigators would have considered every possibility and investigated everyone with a motive to kill Coleman they would have undoubtedly found the missing DNA in the Jaguar that Outley and Scroggins conspired to hide. The government argued that if blood was in the Jaguar then all Outley and Scroggins had to do was say that Fields was in the Jaguar. [ See governments closing argument, pg. 2034; App. A-251]. But that would have been impossible, there would have been no way that Outley and Scroggins could have said that Fields was in the Jaguar because they wouldn't have been able to explain how Outley and Scroggins' blood, where the thorns at the crime scene undoubtedly cut them, how their blood got into the Jaguar intertwined with the blood from Coleman's wounds. Outley and

99

Scroggins only option was to do what they did, conspire to hide the Jaguar so it wouldn't be tested, and "convince" everyone that Fields was the murderer. The government knew this, yet they kept making excuses for Outley and Scroggins conduct, and even went so far as to defraud the Court and jury into believing that Outley and Scroggins was in a blue Jaguar that didn't even exist. The government even argued that Fields "could have switched cars", when in fact there is no evidence of that whatsoever, everyone that saw Fields that night said that Fields was in the 2-door red grand am.

In addition to that, if Investigators would have searched Outley and Scroggins apartments, Scroggins sister's apartments, Outley and Scroggins mother's houses, investigators would have undoubtedly found Outley and Scroggins bloody clothes, and possibly even the murder weapon. This was the argument that Fields attempted to make, as stated in his opening statement, yet once again, on direct appeal the 5th Circuit misconstrued Fields' argument and attributed it all to the lack of DNA found on the victim's body. [ See 5th Circuit opinion, pgs. 35-36; App. A-252].

But we wouldn't be here today had the prosecution not stepped outside the bounds of the law, starting with the perjury in the Grand Jury. Again, the Grand Jury knew that Scroggins was lying and voiced their skeptism about her testimony. To circumvent the way that the Grand Jury was thinking prosecutor Gloff procured Sheriff detective Johnny Spillman and U.S. Marshal Chris Casson to lie and say that Fields became "angry" and/or "Irate" when he came into contact with Coleman at the hospital, yet Coleman's cousin, Tanesha Hilliard had always maintained that Fields was never "angry" and/or "Irate", and as a matter of fact, Fields and Coleman were hugging and kissing. See United States v. Strouse, 286 F.

100

3d 767 [5th Cir. 2002]; United States v. Williams, 504 U.S. 36, 112 S. Ct. 1735, 118 L. Ed. 2d 352 [1992]. In Williams the Court specifically identified rule 18 U.S.C. § 1623 which prohibits perjury before a Grand jury, and 18 U.S.C. § 1622, which criminalizes the Subornation of perjury. Id. Thus,Williams establishes that the prohibition of perjury is among " the few clear rules " that a Court may enforce using its supervisory powers. And by listing " standards of behavior for prosecutors [and others]" the Court intimated that misconduct independent of the government, if precluded by an established standard of behavior, could provide a basis for overturning an indictment. Id. [emphasis added]. In the Bank of Nova Scotia v. United States, 487 U.S. 250, 108 S.Ct. 2369, 101 L. Ed. 2d 228 [1988], the Courts held that " the supervisory power can be used to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those ' few clear rules ' which were carefully drafted and approved by the Court and by Congress to ensure the integrity of the grand jury's functions." Id. [citing United States v. Mechanik, 475 U.S. 66, 74, 106 S.Ct. 938, 943, 89 L. Ed 2d 50 [1986]. Citing Williams, the Court has indicated that the " statutory prohibition against making a false declaration before a grand jury " exemplifies one of the " few clear rules " intended to protect the integrity of the grand jury's functions. [ United States v. Greer, 137 F. 3d 247, 251 [5th Cir. 1998]. See also United States v. Sullivan, 578 F. 2d 121, 124 [5th Cir. 1978]; United States v. Cathey, 591 F. 2d 268, 271-72 [1979] [ Suggesting that witness perjury could provide a basis for investigating a grand jury indictment.] Other Circuits have also suggested that perjury before a grand jury, even without prosecutorial knowledge, can provide a basis for dismissing indictments returned by the grand jury in reliance on the perjured

101

testimony. See E.g., United States v. Hyder, 732 F. 2d 841, 845 [11th Cir. 1984]. Remember the "angry" and/or "Irate" falsity wasn't the only deception in the Grand Jury, U.S. Marshal Chris Casson also misled the Grand Jury in regards to the alleged carjacking too, claiming that Fields' mother lived a block or two from the hospital, and Fields had other friends and family that lived near the hospital where he could have been staking the hospital out. This was a blatant, willful and deliberate lie. Fields' mother lives at least ten blocks east of the hospital and there was a 24-hour surveillance team watching her house; There was no other " friends and relatives " living in the area like Casson misled and deceived the grand jury to believe.

It's obvious that the government set out to make this case into something that it wasn't, and the perjury before the grand jury set the standard for the entire case. The governments scheme to commit perjury in order to obtain Fields' conviction and death sentence constitutes a conspiracy undeniably blatant. The government knew and understood that by " seeking jailhouse testimony " it would eventually morph into a conspiracy. It's no secret that in modern society inmates are now 5k1.1 scouts, meaning they look for individual cases with high stakes to insert themselves into so they can receive " time reductions " on their own sentences; This is evident in the case of inmate Homero Deleon where he writes: " I was the star witness in both of my codefendants trial and they were both convictedd--"; What does this have to do with Fields? Absolutely nothing, the only reason Deleon would have for mentioning it is to let the prosecution know that he's willing to do or say anything to obtain Fields' conviction and death sentence.

In Fields' case, because of his alleged reputation in Waco, Texas, and the police and prosecutors overzealous pursuit of him, they all

disregarded the law, recruiting a bunch of criminals in order to give their case false substance, while knowing that they would engage in a criminal conspiracy so that the government could reach their end result. And given the fact that the government made deals with drug dealers, Burton, Reed, Walker and Deleon while knowing that the drug dealers in Waco, Texas have an agenda against Fields it begs the question: How much did the government know? The Ladon King shooting was the result of a drug dealer paying LaDon King to kill Fields, that failed so they jumped on the governments "bandwagon", using the United States government to do their dirty work. And they've thus far done it in a way to where the government paid them to murder Fields when in fact they would have done it for nothing, just to get rid of Fields.

As we conclude keep in mind that 90% of the evidence herein was never presented to the jury for various reason[s]; (i.e) Fields was given the discovery file too late to go through it all before trial; Fields didn't know how to present it to the jury; The Judge impeded or hindered Fields from presenting it by sustaining the prosecutions misleading and deceptive objections; The government didn't give Fields the evidence to present. [ The photos of the Grand Am pre forensics to prove that detective Morris Colyer lied when he said that the car had been detailed]; The government defrauded the jury into believing something contrary to what the evidence really is; etcetera, etcetera, etcetera...

Fields is innocent and this record warrants the unusual remedy of reversal for cumulative error. United States v. Bell, 367 F. 3d 452, 471 [5th Cir. 2004] [ cumulative error doctrine provides relief only when constitutional errors so "fatally infect the trial" that they violate fundamental fairness" ] [citing Derden v. McNeel, 978 F. 2d 1453, 1457 [5th Cir. 1992] [en banc]. " Claims under the cumulative error doctrine

[may be] sui generis," United States v. Sepulveda, 15 F. 3d 1161, 1196 [1st Cir. 1993], but so was the rare combination of constitutional violations that marred this trial. Each justifies reversal standing alone, but if the Court disagrees, it should cumulate the harm that resulted from all the constitutional errors and reverse on that basis.

The Court should also reverse because there is an unacceptable risk that the jury imposed Fields' death sentence " under the influence of passion, prejudice, or any other arbitrary factor." 18 U.S.C. § 3595 [c] [2] [A]. Those arbitrary and prejudicial factors include, but are not limited to, the impact of Fields' forced self-representation on the development of the record during the guilt phase; the numerous acts of perjury by the government[s] witnesses, especially those in law enforcement; the repeated acts of suborning perjury by the prosecution; the Judge's abuse of discretion. Each of these arbitrary influences warrants vacating Fields' conviction[s] and death sentence under § 3595 [c] [2] [A], and collectively they compel that conclusion.

The Court should also exercise its supervisory authority over the federal courts to reverse the judgement below in the interests of justice. 28 U.S.C. § 2106 [ giving this court broad powers to craft such remedy as " may be just under the circumstances."] Reversals of convictions under the court's supervisory power must be approached cautiously, United States v. Payner, 447 U.S. 727, 734 [1980], but that step is fully warranted here by the combination of judicial error, prosecutorial misconduct and criminal violations. See United States v. Ornelas-Rodriguez, 12 F. 3d 1339, 1349 [5th Cir. 1994] [ Court can exercise supervisory power to "deter further illegal conduct".] This Court has observed that the " underlying purpose[s] of [its] inherent supervisory powers " include [1] remedying a violation of a recognized

104

right, and [2] preserving judicial integrity by insu... that the conviction rests on appropriate evidence validly before the jury. ... of those purposes would be served by exercising that authority here. Mr. Fields is innocent and his conviction is the direct result of a criminal conspiracy in which the government chose to join and/or aid and abet. Schiro v. Summerlin, 124 S.Ct. 2519, 2528 [2004] [ Breyer, J., joined by Stevens, Souter and Ginsburg, JJ, dissenting] [" Great writs basic objectives "include" protecting the innocent against erroneous conviction"]; Dretke v. Haley, 541 U.S. 386, 398-99 [2004] [ Stevens, J., dissenting ] [ " Habeas Corpus is, and has for centuries been a ' bulwark against convictions that violate fundamental fairness."] Bousley v. United States, 523 U.S. 614, 620 [1998] ["One of the 'principal functions of habeas corpus [is] " to assure that no man has been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted."] O'Neal v. McAninch, 513 U.S. 432, 442 [1995] [ " basic purposes underlying the writ of habeas corpus " include curing " error of cunstitutional dimension-the sort that risks an unreliable trial outcome and the subsequent conviction of an innocent person."] Schlup v. Delo, Supra. [T]he individual interest in avoiding injustice is most compelling in the context of Actual innocence. The quintessential miscarriage of justice is the execution of a person who is innocent. Indeed, concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system." [ footnote omitted; citing numerous authorities]; Id. at 326 [ " paramount importance of avoiding the injustice of executing one who is actually innocent."] Id. at 326 n. 42 [ " fundamental injustice would result from the erroneous conviction and execution of an innocent person."] For those reasons Fields conviction[s] and death sentence should be reversed.