APP-31

# No. 13-70025

## IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

- against -

SHERMAN LAMONT FIELDS,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, WACO DIVISION (W-09-CV-009, W-01-CR-164)

## DEFENDANT-APPELLANT SHERMAN LAMONT FIELDS' MOTION TO RECUSE THE HONORABLE EDITH H. JONES

### THIS IS A CAPITAL CASE

JEFFREY ELLIS
OREGON CAPITAL RESOURCE CENTER
621 SW Morrison St., Suite 1025
Portland, OR 97205
(206) 218-7076

PETER J. ISAJIW
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
(212) 504-6000

*Attorneys for Defendant-Appellant
Sherman Lamont Fields*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    APPELLANT: Sherman Lamont Fields

2.    APPELLANT'S ATTORNEY: Jeffrey Ellis, Oregon Capital Resource Center, 621 SW Morrison Street, Suite 1025, Portland, OR 97025

3.    APPELLANT'S PRO BONO ATTORNEY: Peter J. Isajiw, Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, NY 10281

4.    APPELLEE: United States of America

5.    APPELLEE'S ATTORNEY: Joseph H. Gay, Jr., United States Attorney, Western District of Texas, 601 N.W. Loop 410, Suite 600, San Antonio, TX 78216

6.    APPELLEE'S ATTORNEY: Jennifer Sheffield Freel, United States Attorney, Western District of Texas, 816 Congress Avenue, Suite 1000, Austin, TX 78701

/s/ Jeffrey Ellis
Jeffrey Ellis
Peter J. Isajiw
*Attorneys of Record for Mr. Fields*

-i-

Defendant-Appellant SHERMAN LAMONT FIELDS, through his undersigned counsel, hereby moves to recuse Hon. Edith H. Jones, Circuit Judge, from any further participation in this appeal pursuant to 28 U.S.C. § 455, the Fifth Amendment to the U.S. Constitution, and Canon 3C of the Code of Conduct for United States Judges as incorporated in this Court's local rules.

## PRELIMINARY STATEMENT

Defendant-Appellant Sherman Lamont Fields ("Fields") brings this motion for recusal based on facts set forth in a complaint for judicial misconduct concerning remarks by Circuit Judge Jones during a public lecture entitled "Federal Death Penalty Review" at the University of Pennsylvania School of Law on February 20, 2013, which was supported by several sworn affidavits by witnesses in attendance during that lecture and filed by thirteen separate complainants, including representatives of the Mexican Capital Legal Assistance Program, the NAACP, and several distinguished legal ethics professors, among others ("Complaint"). Ex. A.[1] The allegations in the Complaint, if true, undermine Judge Jones' ability to impartially determine Fields' appeal should she be assigned to any further proceedings in this matter.

In the Complaint, Judge Jones is alleged to have made public remarks which demonstrate personal biases against racial minorities and the mentally disabled. Her alleged comments evince her insensitivity toward the justification

---

[1]   All references to "Ex." herein refer to the Exhibits to the Declaration of Jeffrey Ellis In Support of Defendant-Appellant Sherman Lamont Fields' Motion to Recuse the Honorable Edith H. Jones, dated February 25, 2014.

and administration of capital punishment and, specifically, cast doubt on her ability to impartially apply controlling legal precedent with respect to constitutional claims brought by those on death row who have challenged their convictions and death sentences on grounds of actual innocence or mental disability – like Fields has done. The Complaint's allegations, substantiated by detailed affidavits sworn by disinterested witnesses, create the appearance of partiality, if not outright bias, against Fields, an African American defendant challenging his conviction and death sentence based on claims of actual innocence and mental illness.

## STATEMENT OF FACTS

### A.    Procedural History

In January 2004, Fields was convicted of escape and murder, among other counts, and was subsequently sentenced to death. Brief for Defendant-Appellant Sherman Lamont Fields, No. 13-70025 (Dkt. No. 00512440612) ("Br.")[2], at 4. In January 2009, Fields filed a motion for a new trial and to vacate his conviction and death sentence pursuant to 28 U.S.C. § 2255, and amended his motion in April 2010. *Id.* at 5. The District Court denied Fields' motion and also denied a subsequent motion for reconsideration. *Id.* at 6.

On August 1, 2013, Fields timely filed a notice of appeal of the District Court's denial of Fields' § 2255 motion to this Court. Br. at 6; Dkt. No. 00512335473. On November 13, 2013, Fields filed a motion seeking a Certificate of Appealability and a brief in support thereof. Dkt. Nos. 00512440609 (Motion),

---

[2]    All "Br. at ___" references are to the physical pages of the brief, not the sequential pagination assigned by the ECF system.

00512440612 (Brief). This motion is still pending and has not been fully briefed. While Fields does not know whether Circuit Judge Jones will be assigned to the panel that will decide Fields' appeal, Judge Jones has already participated in these proceedings. *See* Dkt. No. 512499350 (Jan. 14, 2014 Order).

### B. Fields' Background and Relevant Social History

Fields has been on death row since his conviction in 2004. He is African American and was born into a poor family in Waco, Texas. Br. at 7. His family had been victimized by racial intimidation and animus for generations, enduring brutal mistreatment during a period of intense racial violence in central Texas. *Id.* at 7-9. Fields' upbringing was characterized by shocking loss, including the violent deaths of several close friends and family members. *Id.* at 9-12. Complicating his profoundly tragic upbringing, and likely as a result of it, Fields was diagnosed with severe Posttraumatic Stress Disorder ("PTSD") and atypical bipolar disorder as a teenager, and is prone to paranoia and delusions. *Id.* at 11-12. Fields has suffered from these conditions throughout his adult life, including during his trial and subsequent proceedings. *Id.* Fields' § 2255 motion and present appeal asserts, *inter alia,* that he was denied his constitutional right to a fair trial because the District Court permitted Fields to represent himself despite his incompetence resulting from his mental illness. *Id.* at 12-14. Additionally, Fields contests his conviction on the ground that he is actually innocent of the crimes for which he was convicted. *Id.* at 121-30.

C.   **The Complaint For Judicial Misconduct Alleged Against Circuit Judge Jones**

As alleged in the Complaint, on February 20, 2013, Judge Jones gave a public lecture at the University of Pennsylvania School of Law entitled "Federal Death Penalty Review", which was ostensibly an opportunity to "discuss federal death penalty review through the perspective of a federal judge." Ex. A at 1 n.2; Ex. A, Bookman Aff. ¶ 3. Judge Jones's lecture discussed several topics reflecting a bias against certain racial groups. Judge Jones allegedly stated:

> "[C]ertain racial groups like African Americans and Hispanics are predisposed to crime" and "'prone' to commit acts of violence." She made "generalized and stereotypical comments about racial groups and their 'criminal tendencies.'" Judge Jones stated that "race" was merely a "red herring" "thrown up by opponents of capital punishment," and that no case had ever been made for "systemic racism." She also asserted that "certain systemic classes of crimes" exist and that "certain racial groups commit more of these crimes than others." She said that "sadly some groups seem to commit more heinous crimes than others." When asked to explain her remarks, she stated that there was "no arguing" that "Blacks and Hispanics" outnumber "Anglos" on death row and "sadly" it was a "statistical fact" that people "from these racial groups get involved in more violent crime." By way of example, she asserted as a "fact" that "a lot of Hispanic people are involved in drug trafficking," which itself "involved a lot of violent crime." She "dismissed race as a legitimate concern in how the death penalty was administered". . . . During the question-answer portion of the program, Judge Jones "lost her composure" to an extent that "the host of the program ended the program abruptly". . . .

Ex. A at 3 (citations omitted).

In addition to these racially charged remarks, Judge Jones allegedly made certain derogatory comments which demonstrated her lack of partiality with respect to capital defendants who claim they were unlawfully convicted as a result of mental disabilities. According to the Complaint, Judge Jones

> characterized capital defendants' assertions of "mental retardation" as "red herrings." She stated that she believes it is a disservice to the "mentally retarded" to exempt them from the death sentence, and "expressed disgust at the use of mental retardation as a defense in capital cases." She consistently asserted that the manner in which these defendants committed their crimes . . . proved that they were not "mentally retarded." As one audience member stated, "in describing . . . what Judge Jones said about these cases, I am not able to capture the complete outrage she expressed over the crimes or the disgust she evinced over the defenses raised, particularly by the defendants who claimed to be mentally retarded". . . . Judge Jones's disgust at how these defendants were "using mental retardation" was very evident and very disconcerting.

*Id.* at 5 (citations & footnotes omitted). Judge Jones also criticized the U.S. Supreme Court's death penalty jurisprudence, specifically its decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that it was unconstitutional to execute the mentally retarded. *Id.* at 1, 5 n.11.

Judge Jones allegedly doubted that innocent defendants would ever be sentenced to death, and, therefore, convicted defendants who claim innocence were likely lying. *See* Ex. A at 6. According to the Complaint, Judge Jones was "very dismissive of claims of innocence. She did not take seriously the possibility that innocent people had been sentenced to death." *Id.* "'[R]eversals of those who

-5-

were allegedly innocent were really based on "technicalities", not innocence.'" *Id.* (citation omitted).

Moreover, Judge Jones allegedly "advocated her personal religious views as a basis for justifying the death penalty." Ex. A at 7. According to the Complaint, she stated that "'a killer is only likely to make peace with God and the victim's family in that moment when the killer faces imminent execution, recognizing that he or she is about to face God's judgment.'" *Id.* (citation omitted). According to Judge Jones, she was inspired to adopt this philosophy after reading an online article called "Hanging Concentrates the Mind," in a Catholic magazine titled *Crisis. Id.* That article, which purports to summarize the Vatican's position on capital punishment, concludes by observing that "'the coercive power of legitimate human authority' has its roots in 'the *sources of revelation and traditional doctrine*' ... [which] have 'a general and abiding validity.'" Ex. B at 3 (citation omitted).

The Complaint alleges that Judge Jones violated Canons 1 through 4 of the Code of Conduct for United States Judges, which, among other things, require judges to "'uphold the integrity and independence of the judiciary'" (Canon 1), "'avoid impropriety and the appearance of impropriety in all activities'", "'act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary'" (Canon 2), be "'patient, dignified, respectful, and courteous'" and avoid comments on "'pending or impending'" matters (Canon 3), and avoid participating "'in extrajudicial activities that detract from the dignity of

-6-

the judge's office or reflect adversely on the judge's impartiality . . .'" (Canon 4). Ex. A at 7-10 (*citing* Code of Conduct for United States Judges, Canons 1-4).[3] These allegations are supported by affidavits of legal ethics experts, who concluded that Judge Jones violated the canons of judicial conduct, including Canon 3. *See* Ex. A, McCormack Aff. ¶ 17 ("[I]t is my opinion that Judge Jones violated the ethical standards applicable to federal judges under the Code of Conduct for United States Judges); *see also* Ex. A, Hardwick Aff. ¶¶ 12-55 (concluding that Judge Jones would be sanctioned for violations of Texas rules of judicial and professional ethics).

The Chief Judge of the Fifth Circuit requested a transfer of the proceedings against Judge Jones, and on or around June 12, 2013, Chief Justice John Roberts granted this request and transferred the proceedings to the Judicial Council of the District of Columbia Circuit. *See* Ex. C. To the best of Fields' and his undersigned counsel's knowledge, the allegations against Judge Jones are pending and no findings of fact have issued.

Judge Jones' remarks and the allegations set forth in the Complaint were widely reported by respected news organizations. The *New York Times* quoted a prominent legal ethics expert who opined that "'[i]f I were a parent of a black with borderline IQ accused in a capital case, would I be distressed in knowing that Judge Jones was sitting on my case? . . . Yes, I would. She seems to have made up her mind on these issues. *She is slanted. That is the whole point of*

---

[3]   http://www.uscourts.gov/RulesAndPolicies/CodesOfConduct/CodeConduct   United   States Judges.aspx.

*the impartiality requirement.*'" Ex. D (citation omitted; emphasis added). In the same article, another respected legal ethics expert suggested that if Judge Jones "really did say that death penalties serve the condemned by forcing them to face God . . . 'during sentencing, that sentence would be vacated . . . . *It suggests that she believes she is helping the accused by giving a death sentence.* That is totally inappropriate.'" *Id.* (citation omitted; emphasis added); *see also* Ex. E; Ex. F.

## ARGUMENT

A judge must recuse herself "in any proceeding in which [the judge's] impartiality might reasonably be questioned,"[4] 28 U.S.C. § 455(a), or if the judge "has a personal bias or prejudice concerning a party. . . ." 28 U.S.C. § 455(b)(1). Section 455(a) is interpreted under an objective standard, and a judge must recuse herself if "a reasonable and objective person, knowing all of the facts would harbor doubts concerning the judge's partiality." *United States v. Jordan*, 49 F.3d 152, 155 (5th Cir. 1995); *see Liljeberg v. Health Servs. Acq. Corp.*, 486 U.S. 847, 860 (1988) ("'The goal of section 455(a) is to avoid even the appearance of partiality'") (citation omitted); *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993)

---

[4] Canon 3C of the Code of Conduct for United States Judges, as adopted by the Judicial Conference of the United States, incorporates § 455. In the "Other Internal Operating Procedures" of this Court's local rules, the "Recusal or Disqualification of Judges" subsection (a) states, in relevant part, "Judges must disqualify themselves under circumstances set forth in 28 U.S.C. § 455 or in accordance with Canon 3C, Code of Conduct for United States Judges as adopted by the Judicial Conference of the United States." Rules and Internal Operating Procedures of the United States Court of Appeals for the Fifth Circuit, Other Internal Operating Procedures, http://www.ca5.uscourts.gov/clerk/docs/5thcir-iop.pdf. As such, a violation of Canon 3C is a separate ground for recusal. A legal ethics expert who submitted an affidavit in support of the Complaint concluded that Judge Jones violated Canon 3. Ex. A, McCormack Aff. ¶ 17.

-8-

(requiring recusal as a result of judge's public remarks, because the judge "deliberately ma[de] the choice to appear in such a forum at a sensitive time to deliver strong views on matters which were likely to be ongoing before him", creating the appearance of bias). Recusal "must be guided, not by comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the facts and circumstances of the particular claim." *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999). If close, the balance must tip in favor of removal. *See Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 484-85 (5th Cir. 2003).

A criminal defendant's right to an impartial judiciary is embedded in the Due Process Clause of the Fifth Amendment to the U.S. Constitution, which mandates a "fair trial in a fair tribunal" for every defendant. *In re Murchison*, 349 U.S. 133, 136 (1955). A judge violates a defendant's due process rights if she is biased against the defendant. *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997). And even if a judge has no actual bias, but a bias may be apparent, a judge must recuse to avoid offending due process. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986); *United States v. Couch*, 896 F.2d 78, 82 (5th Cir. 1990) (Due process "requires a judge to step aside when a reasonable judge would find it necessary to do so").

Circuit Judge Jones must recuse herself because her impartiality might reasonably be questioned as a result of her alleged public remarks. These actual or apparent biases bear directly on the circumstances of Fields' case.

First, Judge Jones' comments suggest that she lacks partiality with respect to matters of race. Specifically, she made derogatory statements

-9-

concerning African Americans and Hispanics by making the unfounded and offensive generalization that such racial groups were "'predisposed to crime'" and "''prone" to commit acts of violence.'" Ex. A at 3 (citation omitted). Judge Jones further opined that "'some groups seem to commit more heinous crimes than others,'" and "'dismissed race as a legitimate concern in how the death penalty was administered.'" *Id.* (citation omitted). Fields is an African American whose family has long been victimized by racial antagonism and violence, and Fields claims that this victimization and racial violence, among many other factors, contributed to his mental illness and inability to competently represent himself during the guilt phase of trial. Br. at 7-12, 94-107. Fields also claims that he did not commit the violent crimes for which he was convicted and sentenced to death and that his trial counsel failed to effectively challenge critical pseudo-scientific "expert" testimony concerning Fields' risk of "future dangerousness." *Id.* at 121-44. Should Judge Jones participate in this appeal, her comments that members of certain racial groups – including African Americans such as Fields – are prone to violence would, at the very least, create the appearance of partiality on matters of race and future dangerousness which require recusal.

Second, if her remarks as alleged are true, Judge Jones appears to hold a bias against death row inmates who have challenged their convictions on the basis of mental disabilities. Judge Jones "stated that she believes it is a disservice to the 'mentally retarded' to exempt them from the death sentence, and 'expressed disgust at the use of mental retardation as a defense in capital cases.'" Ex. A at 5 (citation omitted). She insisted that "the manner in which these defendants committed their crimes" proved that they were not, in fact, mentally disabled. *Id.*

Those in the audience at Judge Jones' lecture described "'the disgust [Judge Jones] evinced over the defenses raised, particularly by the defendants who claimed to be mentally retarded.'" *Id.* These alleged biases plainly bear on Fields' present appeal. In his motion for a Certificate of Appealability, Fields argues that he was deprived of his constitutional rights as a result of the District Court's decision to allow Fields to represent himself at trial despite his debilitating mental illnesses. Br. at 94-107. Fields is bipolar and suffers from severe paranoid delusions and PTSD. *Id.* at 11. These conditions prohibited Fields from adequately representing himself at trial, and thus the District Court committed reversible error in allowing Fields to proceed *pro se. Id.* at 94-107. Judge Jones' well-documented skepticism of death row inmates who have challenged their convictions and sentences as a result of mental deficiencies therefore disqualifies her from participating in any further proceedings relating to Fields' appeal.

Third, the Complaint alleges that Judge Jones was "'very dismissive of claims of innocence. She did not take seriously the possibility that innocent people had been sentenced to death.'" Ex. A at 6. Further, Judge Jones "'said that reversals of those who were allegedly innocent were really based on "technicalities", not innocence.'" *Id.* (citation omitted). Effectively, Judge Jones has already passed judgment on Fields because in his § 2255 motion and his present appeal, Fields vigorously argues that he is actually innocent of the crimes for which he was convicted, a position he has consistently maintained since his trial. Br. at 121-30. Thus, Judge Jones could not impartially render judgment on Fields' appeal.

-11-

Fourth, Judge Jones allegedly "advocated her personal religious views as a basis for justifying the death penalty." Ex. A at 7. She is alleged to have stated that "'a killer is only likely to make peace with God and the victim's family in that moment when the killer faces imminent execution, recognizing that he or she is about to face God's judgment.'" *Id.* Judge Jones allegedly "'talked about how the imminent prospect of execution forced the criminal to confront his deed, and she said this as justification for the death penalty." *Id.* This apparent appeal to religious authority for a judicial matter as serious as the federal government's attempt to take the life of one of its citizens clearly creates a situation where Judge Jones' impartiality could reasonably be questioned.

Fifth, Judge Jones sharply criticized the Supreme Court's death penalty jurisprudence, observing that the Court's decision in *Atkins* – in which the Court held that it was unconstitutional to execute the mentally retarded – was "ill-advised" and created a "'slippery slope'" by which a defendant's intelligence must be considered under certain circumstances. Ex. A at 1; Ex. A, Bookman Aff. ¶¶ 20-21. According to Judge Jones, the Supreme Court has "micromanaged" capital punishment, and she speculated that "the Supreme Court's next attempt at meddling with the death penalty will come by 'back-dooring' through the *Martinez* case the right to counsel in post-conviction proceedings. [Judge Jones] seemed to think that this would be a travesty."[5] Ex. A, Bookman Aff. ¶ 21. These views do not comport with the fair administration of capital punishment under the Constitution, which affords, among other things, certain procedural protections to

---

[5]    *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012); *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).

the accused as well as a right to a fair determination of punishment for the convicted. However, according to Judge Jones, the imposition and effectiveness of the death penalty is justified through extralegal means – her personal religious philosophy. *See* Ex. A at 7. Judge Jones' disdain for the Supreme Court's capital punishment jurisprudence raises doubts that she could impartially apply controlling authority. Fields challenges both his conviction and sentence pursuant to bedrock principles of Constitutional law. Judge Jones' participation in Fields' appeal would result in an unconstitutionally biased determination and undermine public confidence in the judiciary.

Judge Jones' public comments demonstrate a judicial bias against Fields and those similarly situated. Judge Jones' impartiality "might reasonably be questioned" and it is reasonable to infer her bias against Fields here. *See Cooley*, 1 F.3d at 992, 994. Judge Jones' participation in Fields' appeal would deprive him of his Fifth Amendment rights to a fair proceeding. Accordingly, Judge Jones should be recused from any further proceedings in connection with Fields' appeal.

## CONCLUSION

For the foregoing reasons, Fields respectfully requests that this Court grant his motion to recuse the Honorable Edith H. Jones.

Dated:    February 25, 2014

Respectfully Submitted.

By: /s/ Jeffrey Ellis
     Jeffrey Ellis

Oregon Capital Resource Center
621 SW Morrison St., Suite 1025
Portland, OR  97205
Telephone:  (206) 218-7076
Email:        JeffreyErwinEllis@gmail.com

Peter J. Isajiw
Cadwalader, Wickersham & Taft, LLP
One World Financial Center
New York, New York  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666
E-mail:       Peter.Isajiw@cwt.com

*Attorneys for Mr. Fields*

## CERTIFICATE OF CONFERENCE

I hereby certify that on February 18, 2014, counsel for the Government advised me that the Government opposes the relief requested in this Motion.

Dated:    February 25, 2014

/s/ Jeffrey Ellis
Jeffrey Ellis
Peter J. Isajiw

*Attorneys for Mr. Fields*

## CERTIFICATE FOR ECF PLEADINGS

I hereby certify that: (1) required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated:    February 25, 2014

/s/ Jeffrey Ellis
Jeffrey Ellis

-16-